GUMBINSKY BROS. COMPANY, Respondent, *v.* ARTHUR SMALLEY and Another, Copartners, Trading as EDWIN BUTTERWORTH & Co., Appellants.

First Department, December 22, 1922.

Sales — action by seller for breach of contract of sale of paper — customs and usages — parol evidence admissible to show trade meaning of words and phrases contrary to popular meaning — contract guaranteed paper to be " free from ground wood " — parol evidence admissible to show that phrase meant not more than three per cent of ground wood — refusal to accept paper was arbitrary — evidence shows that paper tendered was free from ground wood — foreign corporation not doing business here may sue resident of this State — single transaction does not constitute doing business.

Parol evidence is admissible to show that by customary trade usage a peculiar meaning has become attached to words or phrases used in a contract, though the meaning so acquired is contrary to the common and popular meaning thereof.

Accordingly, in an action by a seller for the breach of a contract of sale of paper, evidence was admissible on the part of the plaintiff to show that the meaning of the words " No. 1 Heavy Books & Magazines, guaranteed free from ground wood " was that the paper was not to contain over three per cent of ground wood in accordance with the trade meaning of the phrase as understood generally throughout the United States.

The evidence establishes that the refusal of the paper tendered was arbitrary and capricious.

The jury was justified in finding that the paper tendered was free from ground wood.

The plaintiff, a foreign corporation, could maintain this action against the defendant, a resident of this State, on the contract which consisted of an order directed to the plaintiff at its home office at Chicago, Ill., which was delivered to the vice-president of the plaintiff in the city of New York and accepted by the plaintiff from Chicago, though it had not procured a certificate of authority, since there was no proof that the plaintiff was doing business within this State with the exception of the single transaction here in question.

DOWLING, J., dissents.

APPEAL by the defendants, Arthur Smalley and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 21st day of April, 1922, upon the verdict of a jury, and also from an order entered in said clerk's office on the 25th day of April, 1922, denying their motion for a new trial made upon the minutes.

*Charles D. Ridgway,* for the appellants.

*I. Maurice Wormser* of counsel [*Joseph Dannenberg* with him on the brief], for the respondent.

GREENBAUM, J.:

The plaintiff is an Illinois corporation not authorized to do business in this State. The defendants are copartners. On August 15, 1919, the defendants signed a written order addressed to plaintiff " Chicago, Ill.," and delivered it to the vice-president of the plaintiff at the Hotel Astor in the city of New York and which so far as material here reads as follows:

" Please enter our order for the following and ship as directed below. Ship to Crocker, Burbank & Co. Association, Wachusett Station, Mass., via cheapest freight. Terms 60 days net, 1800 tons of your own packing of No. 1 Heavy Books & Magazines, guaranteed free from ground wood, etc., at 2.50 per 100 lbs. f. o. b. cars Chicago, Kalamazoo and Detroit. Quality to be satisfactory to Crocker, Burbank & Co. Shipments over a period of 90 days in approximately proportionate tonnage. Shipments to commence at once."

This order was confirmed by a letter dated August eighteenth, from plaintiff written in Chicago, Ill., where the plaintiff had its place of business. Defendants on the same day resold the 1,800 tons of paper stock to Crocker, Burbank & Co. of Fitchburg, Mass., upon · substantially the same terms and conditions as expressed in the order except that the price was three dollars and five cents per 100 pounds f. o. b. Wachusett, Mass. The ninety days for delivery expired about November fifteenth.

The plaintiff shipped thirty-three cars of this merchandise to Crocker, Burbank & Co. between August 18, 1919, and September 9, 1919, aggregating 1,247,205 pounds. A portion of these goods

was accepted. On September eighth plaintiff received a telegram from defendants directing it to hold up further shipments. Oscar Gumbinsky, president of the plaintiff corporation, thereafter came to New York and saw Mr. Jennings, defendants' representative, who said that he could not understand the telegram and advised Gumbinsky to go to Boston. Gumbinsky went to Boston and with Mr. Sargent, defendants' Boston representative, went to Fitchburg to Crocker, Burbank & Co. Gumbinsky testified that he saw Mr. Crocker who picked out a piece of paper from a bale of plaintiff's shipment and told Gumbinsky that it contained unbleached sulphite. Gumbinsky answered: " That is No. 1, books and magazines," which the testimony shows was among the highest grade of papers which were comparatively free from ground wood. Gumbinsky testified that he looked at the paper Crocker had showed him and it was entirely free from ground wood and was No. 1 heavy books and magazines free from ground wood. Crocker further said the bales shipped by plaintiff were too large; that his mills were not located on tracks and that, therefore, the bales were too large for handling. Gumbinsky said he would make them smaller. Crocker said the shipments came in too fast; Gumbinsky said he would " make them slower." Crocker said he bought books and magazines and that there were not enough books. Gumbinsky said that he would put in more books. Crocker then said that he could not use them and he did not want them anyway. Gumbinsky also testified that he told Crocker that he had gone to great expense and had entered into the contract in good faith, that he had a reputation for years for being the largest and best packer of papers and wanted to keep it up and satisfy Crocker. He said he was sure that the cars on the track would be satisfactory to Crocker and asked him to look at them. Crocker refused to do this and refused to take in any further cars which were on the tracks. Crocker admitted that he had only looked at six carloads at most, of the thirty-three shipped, but nevertheless rejected the shipments.

Gumbinsky then asked him whether he would accept the balance of the order if he would ship them Saturday Evening Posts and Ladies Home Journals exclusively although these publications sold at a higher price than the contract price. Crocker said he would not accept this and refused to examine the cars on the track and walked away.

The significant portion of Crocker's testimony as to Gumbinsky's visit to the mills is as follows: " Q. What did you find as to the contents of the bales? A. The general characteristics and contents of the bales was that there was entirely *too large a per-*

*centage* of what we call in the trade ' ground wood papers,' ' unbleached sulphite ' and ' heavily coated papers.' Q. What percentage of the examined contents of the paper was ground wood? A. I would have to refer to my records as to the exact percentage. I recall it was between 10 and 20 per cent. Q. And you found this excess of ground wood and coated paper that you have spoken of in all the different bales that you saw? A. In all the bales that I saw and the general characteristic of every car I examined. I should say nine in all the bales I saw, to be more exact."

It should be here noted that Crocker did not complain because the stock had some " ground wood " but because " there was entirely too large a percentage of what we call in the trade ' ground wood papers,' ' unbleached sulphite and ' heavily coated papers.' " He further testified: " Q. Were any of the bales that you sorted and examined in your opinion No. 1 heavy books and magazines, free from ground wood? A. I don't care to specify that there were no bales that were not ' Heavy books and magazines.' * * * Q. Mr. Crocker, what percentage of what you examined do you consider not No. 1 heavy books and magazines? A. I should say at least ninety per cent or more. Q. How long was Mr. Gumbinsky with you that morning? A. In the neighborhood of one and one-half or two hours. Q. And you were discussing with him the quality of these shipments? A. Yes sir. Q. What did you say to Mr. Gumbinsky about the quality of these shipments and whether they were satisfactory to you? A. I said they were entirely unsatisfactory."

Crocker admitted that Gumbinsky offered to supply Saturday Evening Posts and Ladies Home Journals which would be free from ground wood, etc., but in regard to this offer he testified as follows: " Q. What was your reason for not accepting this offer of Mr. Gumbinsky? A. Two reasons. In the first place, we didn't care to have stock of that type and the second reason was that the contract as we had it with Edwin Butterworth Co. had not been fulfilled and we had definitely stated that it was cancelled as far as we were concerned and we did not care to do any further business with Gumbinsky direct or indirect."

In connection with this, it is to be noted that Charles H. Wood, witness for defendants, testified as follows: " Q. Have you ever seen ground wood or heavily coated paper in Saturday Evening Posts and Ladies Home Journals? A. I don't think I have."

Plaintiffs produced considerable testimony showing in detail how the merchandise was handled and inspected at its factory and what precautions were taken so that the goods to be shipped

should be free from " ground wood." The testimony was that there was less than three per cent ground wood in the magazines and books packed for and sent to Crocker's mill.

Appellant urges the following grounds for reversal: 1. That the trial judge committed error in admitting, over the objection of defendants' counsel, evidence of an alleged trade usage or custom which contradicted and varied the contract entered into between the parties. 2. That Crocker expressed himself dissatisfied with the goods which had been sent. 3. That the plaintiff was a foreign corporation which did business in this State without a certificate. Appellant claims that under the contract the defendants bought and the plaintiff agreed to deliver " 1,800 tons of No. 1 Heavy books and magazines, guaranteed free from ground wood," and that the legal and necessary meaning of this term is that there was to be no ground wood in the stock delivered. The court permitted the plaintiff to prove a universal custom or usage in the trade as to the meaning of the words " free from ground wood " over defendants' objection and exception. The question, therefore, is, whether the court was justified in permitting evidence of the meaning of the words " No. 1 heavy books and magazines, guaranteed free from ground wood." I take it that the word " guarantee " is to be used in the same sense as though the word " warranted " was used. In other words, it was an expressed guaranty or warranty that the delivery shall consist of No. 1 heavy books and magazines free from ground wood. " Ground wood " is a word well known in the trade. It refers to the refuse found in paper made of wood pulp. The authorities are numerous and consistent in support of the ruling of the court. The evidence was ample that the trade meaning of the phrase No. 1 heavy books and magazines free from ground wood, etc., was known all over the United States and that it meant that the merchandise shipped was not to contain over three per cent of ground wood.

There was only one witness for the defendant, Horace B. Sargent, who attempted to contradict plaintiff's witnesses as to custom. Mr. Sargent was employed by Edwin Butterworth & Co., the defendants in this action, and was the person who accompanied Gumbinsky to the Crocker mill. He was asked by the court as follows: " Q. Tell anything he [referring to Mr. Crocker] said in the presence of Mr. Gumbinsky. A. He said: ' Your stock is not a good delivery of No. 1 heavy books and magazines, containing too much ground wood, *too much dirt;* the bales are too heavy, too hard to handle, and so forth and is altogether a bad delivery.' " (Italics ours.)

This witness thus confirms Crocker that the delivery was not

satisfactory, because there was *too much* ground wood, *too much dirt* and because the bales were too heavy to handle. This witness was then asked by defendants' counsel as to the custom in the trade in New England among the mills which make bag paper, in which the contract provides " guaranteeing free of ground wood," that " the seller can tender to the purchaser stock containing three and three and one-half per cent or six or seven per cent ground wood, and he have to take it? " To this the witness said: " No, sir, there is not."

It is to be observed in considering the foregoing question and answer that there was no claim made by the plaintiff that it would be a good delivery to tender stock which contained six or seven per cent ground wood or even three and one-half per cent. The testimony of the plaintiff was limited to three per cent. This witness was further asked: " You never heard of any such custom in the trade? A. Might I qualify my answer somewhat? I know of one mill that we do business with that will pass three per cent ground wood. * * * We have to guarantee and sell our goods free from ground wood. Q. And guaranteed means that it shall not have any ground wood in it? A. There shall not be any. Whatever there is in there is charged back to us, every pound."

Upon cross-examination upon this point the witness was asked as follows: " Q. You said something about the fact that they charged back the ground wood in your direct examination? A. Yes, sir. Q. What do you mean by that? A. Any ground wood that it found in the book stock which we sell to the mills is charged back to us at the invoice price and an allowance made for the ground wood papers at market value of ground wood papers or a little bit less. * * * Q. You are now speaking of the custom so far as you observe custom? A. So far as we observe it with the mills that we do business with. Q. Exactly so; when mills get your stock and find ground wood in it, the universal custom has been, so far as your experience is, that they sort out the ground wood and charge you with it, but keep the balance? A. They keep the balance of the goods, yes sir. Q. They do not reject the shipment on that account, do they? A. I have never had any rejection, no sir."

The witnesses produced by the plaintiff were apparently disinterested.

John H. O'Connell, the national president of the American Pulp and Paper Mill Superintendents Association, testified as follows: " Q. And is that a general custom universally known throughout the trade? A. No. 1 books and magazines should not contain over three per cent ground wood."

James Flett, another witness, testified as follows: " if we buy No. 1 books and magazines free from woody papers, we buy them with an unwritten understanding that if we do not get an excess of three percent, of woody papers, that it is a good delivery, for the reason that three percent of woody papers cannot be detected."

This witness also testified: " And will you tell the court and jury how that custom has grown up, the reason for it, if you know? A. I don't know how it originated, but I know that in our own particular manufacturing units, that it appears to be physically impossible for any method of sorting that we have, to entirely eliminate ground wood."

The deposition of Charles F. Neilson, a disinterested witness, read on behalf of defendants in answer to a question as to the meaning of No. 1 heavy books and magazines free from ground wood, is as follows: " The trade name for No. 1 heavy books and magazines, free of ground wood would permit a small percentage of unbleached sulphite and heavy coated papers as well as crumpled papers which are free from ground wood. It would not permit perhaps over three percent of each of these particular grades, or in fact should the grade contain an excess of three percent ground wood, paper, or an excess of five percent light stock, it might not be considered."

It is well settled that where the words used are technical in nature, or where they have a peculiar significance under the circumstances in which they are used, parol evidence is admissible to show what their meaning is.

The rule is likewise applicable where the words, although they have a common and popular meaning, have also acquired a peculiar meaning between the parties to the contract because such meaning had become attached to them by customary trade usage. The learned counsel for the respondent has collated many authorities on the law of usage applicable to this discussion.

The Court of Appeals, in *Collender* v. *Dinsmore* (55 N. Y. 200) said at page 205: " The rule is that words, or forms of expression which are not of universal use, but are purely local or technical, may be explained by parol evidence, and the same is true of words or phrases having two meanings, one common and universal, and the other peculiar, technical or local. In such case parol evidence may be given of facts tending to show in which sense the words were used. (1 Greenl. Ev. § 295.) "

Prof. Williston states: " But there are now numerous decisions (not all of them of recent date) where words with a clear normal meaning have been shown by usage to bear a meaning which

nothing in the context would suggest. This is not only true of technical terms, but of language, which at least on its face has no peculiar or technical significance; though even today it is still occasionally said by courts that usage cannot control words having ' a definite legal meaning; ' or cannot be used to interpret a contract unless there is an uncertainty on the face of the instrument. So it is often said also that usage is admissible to explain what is doubtful but never to contradict what is plain. If this statement means that usage is not admitted to contradict a meaning apparently plain if proof of the usage were excluded (and this is what the statement seems naturally to mean), it is inconsistent with many decisions and wrong on principle." (2 Williston Cont. § 650.)

In *Nicoll* v. *Pittsvein Coal Co.* (269 Fed. Rep. 968) the contract was for 50,000 gross tons of coal to be shipped in equal monthly installments during a year. The court held that it was competent to prove a usage in the trade that, when there was a shortage, deliveries by the seller among his buyers were apportioned *pro rata.* The Circuit Court of Appeals of this circuit (at pp. 971, 972), through Judge Hough, gave approval of the statement of Professor Williston, above quoted: " * * * Indeed when tradesmen say or write anything, they are perhaps without present thought on the subject, writing on top of a mass of habits or usages which they take as matter of course. So (with Prof. Williston) we think that any one contracting with knowledge of a usage will naturally say nothing about the matter unless desirous of excluding its operation; if he does wish to exclude, he will say so in express terms. Williston, Contracts, Sec. 653. Courts for a long time have rightly been influenced by this belief, until a survey of decisions leads the same learned author to conclude, as we do, that usage has been more potent than any other collateral parol matter to affect, if not control, contractual interpretation. Section 654. * * * "

In *Whitney* v. *Hop Bitters Mfg. Co.* (50 Hun, 601; 2 N. Y. Supp. 438; affd., 121 N. Y. 682, without opinion) the contract was an oral one, but there was no question as to the definiteness of its terms, and so the principle applies to the case at bar. The contract called for " amber-colored bottles, to weigh twenty-two ounces and of uniform weight and color." The court held that evidence of a custom in the trade, that under such terminology certain variations in color and weight were allowable, was admissible, saying, as to the expression in the contract, that it was " not to be understood in the strict sense of the words themselves; for, if they were so construed, the contract would be impossible of performance. They are to be understood in the particular sense

in which they were used in the trade, a product of which is the subject of the contract; and that evidence of usage is admissible to explain words used in such particular sense is well established."

In *Oswego Falls Pulp & Paper Co.* v. *Stecher Lithographic Co.* (215 N. Y. 98), in which the contract involved certain grades of cardboard, the Court of Appeals recently held that it was proper to admit evidence showing a trade usage as to the variation and thickness of the paper, saying: " In other words, to show that it was practically impossible to have such a quantity of cardboard without a variation in some slight degree. Such evidence is admissible, not for the purpose of contradicting the express terms of the contract, but rather to show a trade usage and custom in the manufacture of goods. (*Newhall* v. *Appleton,* 114 N. Y. 140; *Whitney* v. *Hop Bitters Mfg. Co.,* 18 N. Y. St. Repr. 891.) "

An appropriate case upon this question is *Burton* v. *Jennings* (185 Fed. Rep. 382), in which the contract provided for the delivery of lumber " no waney " stock. It was held that evidence was admissible that under such contract a certain limited percentage of " waney wood " could properly be tendered.

The second point made by appellant is that the quality of the stock was not satisfactory to Crocker, Burbank & Co. But they could not arbitrarily refuse to accept the shipment by merely stating that the quality was not satisfactory to them. It must appear that some fair basis existed for rejecting the shipment.

It must be remembered that Crocker, Burbank & Co. were not arbitrators or umpires, but that the merchandise which was sold by the plaintiff to defendants was to be consumed by Crocker, Burbank & Co., and, therefore, the latter practically stood in the shoes of the defendants.

The case of *Stein Co.* v. *Robertson* (167 N. Y. 101), cited in behalf of defendants, is not apropos. There a broker acted as an arbitrator or umpire for the plaintiff and defendant who was not interested. This criticism also applies to *Sorensen* v. *S. A. Companhia General Commercial, etc.* (180 N. Y. Supp. 201), cited by appellants.

In *Wilson* v. *Curran* (190 App. Div. 581) it was held that where a contractor had properly performed the work so as to entitle him to a certificate of an architect, the refusal of the architect to give the certificate is unreasonable and the plaintiff is excused from its production, the court saying (at p. 585): " The result is that where the facts show that the duty rested upon the architect to issue the certificate, his failure so to do will be held to be unreasonable and the contractor relieved from the condition that it must be obtained. It is a rule growing out of the

practical difficulty of the architect's serving two masters, and the milder word ' unreasonable ' is under the circumstances preferred by the courts to the words ' constructive fraud.' "

In *Oswego Falls Pulp & Paper Co.* v. *Stecher Lithographic Co.* (146 App. Div. 241) it was held that where there was a provision in a contract that the thing furnished by one party should be to the satisfaction of the other, the contract could not be capriciously or unreasonably canceled.

There was sufficient in the testimony of the plaintiff and that of the defendants' witnesses, and especially of Mr. Crocker himself, to justify a finding that the refusal of Crocker, Burbank & Co. to accept all of the merchandise, as well as their statement that the quality of the merchandise was not satisfactory to them, was arbitrary and capricious.

But in its final analysis, and regardless of the legal question as to whether expert testimony was permissible as to custom, we find that the case turned upon a question of fact. Crocker testified that, so far as the quality of the goods was concerned, he found that it contained over ten per cent and up to twenty per cent of ground wood. Gumbinsky testified that the goods were free from ground wood. The jury evidently did not accept Mr. Crocker's testimony as convincing. The jury also had the right to take into account Crocker's equivocations and the reasons which he gave for refusing to take. When Gumbinsky told Crocker he would take back any paper that he rejected and make new deliveries from other stock, Crocker refused to entertain the suggestion, although there was ample time under the contract within which plaintiff could have performed.

Crocker also testified that the market had a tendency to fall off. He indeed admitted, and there were offered in evidence orders by Crocker, Burbank & Co. from August 16, 1919, to October 1, 1919, showing that he had purchased the same kind of merchandise in large quantities from twelve firms at an average of about $2.60 delivered, which was a saving of forty-five cents per 100 pounds, and which, figured on 1,800 tons, made a difference of $16,200.

The contract called for deliveries over a period of ninety days in approximately proportionate tonnage. About one-third of the shipment had been made in less than one month's time, so that plaintiff still had about sixty days within which to fulfill the balance of the shipment.

By section 156 of the Personal Property Law (as added by Laws of 1911, chap. 571) a " ' Divisible contract to sell or sale ' means a contract to sell or a sale in which by its terms the price for a por-

tion or portions of the goods less than the whole is fixed or ascertainable by computation."

In such a case section 126 of the Personal Property Law (as added by Laws of 1911, chap. 571) provides as follows:

" 2. Where there is a contract to sell goods to be delivered by stated installments, which are to be separately paid for, and the seller makes defective deliveries in respect of one or more installments, or the buyer neglects or refuses to take delivery of or pay for one or more installments, it depends in each case on the terms of the contract and the circumstances of the case whether the breach of contract is so material as to justify the injured party in refusing to proceed further and suing for damages for breach of the entire contract, or whether the breach is severable, giving rise to a claim for compensation, but not to a right to treat the whole contract as broken."

In *Lowinson* v. *Newman* (201 App. Div. 266) this court very recently laid down as the rule: " *The law is well settled that, where there has been a defective tender of goods contracted to be sold and delivered, and where the position of the buyer has not been altered by reason of such faulty tender, the seller may, within the contract period, rectify his mistake and make delivery of the goods covered by the contract.*" (Italics ours.)

Mr. Justice LAUGHLIN, writing for this court, in the recent case of *Portfolio* v. *Rubin* (196 App. Div. 316; affd. by the Court of Appeals 233 N. Y. 439), in dealing with this same proposition, stated: " The plaintiff had a right, if he acquiesced in the defendant's objection to part of the goods, to replace the rejected goods by others conforming to the contract. [*Pierson* v. *Crooks*, 42 Hun, 571; affd., 115 N. Y. 539.]"

In Williston on Contracts the learned author lays down as a rule (at p. 2344, vol. 3): " Section 1295. Frequently by the terms of a contract a promisor is given a period of time at any moment of which he may make the agreed performance. Such a contract will not be broken until the agreed period has elapsed. *This is true even though the promisor may have made a defective attempt to perform at an earlier day.*" (Italics ours.)

The remaining point of appellant is that the plaintiff was a foreign corporation doing business in this State without a certificate.

In the first place, the proofs show that the contract was in the form of letters, and confirmation of plaintiff's order was sent from Chicago, thus indicating that part of this contract was made in New York and part in Chicago.

There was no proof that the plaintiff was or is doing business within the State of New York. A single transaction does not

constitute doing business within the State.  (*People ex rel. Chicago Junction, etc., Co.* v. *Roberts*, 154 N. Y. 1; *Hovey* v. *DeLong Hook & Eye Co.*, 211 id. 420.)

The judgment and order should be affirmed, with costs.

CLARKE, P. J., MERRELL and FINCH, JJ., concur; DOWLING, J., dissents.

Judgment and order affirmed, with costs.