# VITAPHONE CORPORATION v. HUTCH-INSON AMUSEMENT CO.

## No. 7194.

District Court, D. Massachusetts.

July 25, 1939.

Hill, Barlow & Homans, A. D. Hill, and Faneuil Adams, all of Boston, Mass., for plaintiff.

Withington, Cross, Proctor & Park and Edward C. Park, all of Boston, Mass., for defendant.

FORD, District Judge.

This is an action arising under the Copyright Act of March 4, 1909, Chapter 320, § 25, 35 Stat. 1081, as amended, 17 U.S.C.A. § 25. Originally a suit in equity for alleged infringement of eight copyrighted motion picture films or photoplays involving the defendant in this action along with others not now named, the case was remanded by the Circuit Court of Appeals (1 Cir., 93 F.2d 176) transferring it to the law side under Equity Rule 22, 28 U.S.C.A. following section 723. Jury has been waived.

The facts are as follows:

The plaintiff, The Vitaphone Corporation, and Vitagraph, Inc., are corporations organized under the laws of New York and located in the State of New York. The Hutchinson Amusement Company is a corporation organized under the laws of the State of Maine and operates a motion picture theatre, known as the "New Portland Theatre" in the City of Portland, Maine. The Vitaphone Corporation is engaged in the business of owning, licensing, and distributing motion picture films, and was the owner of certain alleged copyrighted motion picture films, which Vitagraph, Inc., had the exclusive right to distribute, under license, for exhibition purposes.

Vitagraph, Inc., at different times during the year 1935 contracted with the Casco Amusement Corporation, a corporation also conducting a motion picture theatre in Portland, Maine, to supply it with eight motion picture films, known in the business as "shorts," for exhibition in its theatre on certain specified dates. Such films are used in motion picture theatres to fill in between so-called feature pictures and to occupy the time so that the feature picture may "come on" according to the program advertised by the theatre.

Managers of theatres, finding that their feature pictures are not of sufficient length to fill up the time according to their advertised schedule, and not having a "short" film at hand, sometimes request other theatres in their community for a loan of a "short" film to fill up the time on their program.

It is alleged that the defendant, the Hutchinson Amusement Company, which conducts the "New Portland Theatre" under the same management as the theatre operated by the Casco Amusement Corporation, "borrowed," as it is termed, said eight copyrighted "short" films of the Casco Amusement Corporation; and, without any license or authority from either the Vitaphone Corporation or Vitagraph, Inc., exhibited each of said copyrighted motion picture films once on separate days in its "New Portland Theatre," thus constituting an infringement of the Vitaphone Corporation's copyright on each of said

films, which was duly registered in the Copyright Office at Washington as copyrighted films.

It is contended by the defendant (1) that the copyrights are invalid, and (2) that the suit should be abated for the following reasons: (a) it was brought without authority in the plaintiff's name by an association known as the Copyright Protection Bureau; (b) that if the latter had authority to commence the suit it was an unlawful authority because the authority was derived from the membership of the plaintiff in the Copyright Protection Bureau which was engaged in the business of a common barrator; and (c) that the Copyright Protection Bureau was engaged in the unlawful practice of law and the bringing of the suit was in itself an offense against the administration of justice.

■ It will be noted the defendant does not rely upon the last three grounds as justification for the alleged wrong and as a defense on the merits, but only as grounds for abatement for the reasons stated. It might be said in passing, to make clear the position of the defendant, that these matters relied upon could not be availed of by it as a justification for the alleged tort, because of the rule laid down in the following cases. Burnes v. Scott et al., 117 U.S. 582, 6 S.Ct. 865, 29 L.Ed. 991; M. Witmark & Sons, v. Pastime Amusement Co., D.C., 298 F. 470 (affirmed 4 Cir., 2 F.2d 1020); Harms et al. v. Cohen, D.C., 279 F. 276; Radio Corporation of America et al. v. Majestic Distributors, Inc., D.C., 53 F.2d 641; Vitagraph, Inc., et al. v. Grobaski et al., D.C., 46 F.2d 813.

The Copyright Protection Bureau is a service agency maintained by eight major motion picture producing and distributing companies. The distribution of pictures is national. The Copyright Protection Bureau, hereinafter called "The Bureau", is a trade name registered in the name of an individual. It is wholly nonprofit making with no assets, is supervised for the distributors by one Hess, and makes investigations of unauthorized exhibitions of copyrighted photoplays and engages in educational activities concerning the same among the exhibitors throughout the country. Its primary purpose is to inform the exhibitors that the distributors are constantly on the alert that there shall not be any unauthorized

exhibitions of their motion pictures, thereby protecting the exhibitors in their contract rights of priority and unauthorized free showings. It also checks up irregular practices in the various exchanges of the distributors such as unauthorized loaning out of pictures by employees of the exhibitors. Further, it conducts a statistical information service in reference to the availability of theatres for the benefit of the distributors. The fund supplying the Bureau is contributed each year by the distributors to meet the expense of the activities undertaken by the Bureau. This fund is known as a special account and from this the expenses of the Bureau are paid, including the salaries of all persons associated with the Bureau. The amount of the contribution on the part of each distributor depends on the latter's size and the number of pictures put out. The special fund or account consists of two items, one for the salaries of those connected with the investigation agency of the Bureau and the other item for expenses of the legal department of the Bureau. The investigating department concerns itself principally with suspected infringements of copyrights and makes reports concerning these to the Bureau. If infringement is noted, letters are sent to infringers and conferences with the latter arranged. According to a practice that has existed for a great many years, settlements are accepted by the Bureau without specific communication with the producers and in the event no settlement is reached and an infringement noted, suit is brought. The costs of suit are charged to the particular distributor concerned, with its consent, and paid from the special account. The distributors are notified in the event of settlements by letter and the proceeds are credited to the distributor whose copyright has been infringed, as also are the proceeds from executions obtained as a result of suit, and these credits tend to diminish the amount which the distributor pays in order to support the activities of the Bureau. Audits are made each year of the accounts of the Bureau and meetings are held annually with the sales managers of the distributing companies and detailed reports are made to them.

■ The first ground upon which invalidity of the copyright is based is that the photoplays in question showed works so trivial, vulgar and of such little artistic value that they did not merit the protection

of the copyright laws. As has been stated above, these pictures were "shorts" and the subjects were comedy, but they had a story, not of great intellectual value, to be sure, but it must be admitted they showed originality. As the Court said in Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 250, 251, 23 S.Ct. 298, 300, 47 L.Ed. 460:

"The least pretentious picture has more originality in it than directories and the like, which may be copyrighted. * * *

"It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations * * * Yet if they command the interest of any public, they have a commercial value,—it would be bold to say that they have not an æsthetic and educational value,—and the taste of any public is not to be treated with contempt."

And it has been decided that motion picture photoplays of the type here in question are entitled to protection under the provisions of the Copyright Act. Patterson v. Century Productions, Inc., et al., 2 Cir., 93 F.2d 489; Tiffany Productions Inc., v. Dewing et al., D.C., 50 F.2d 911; Metro-Goldwyn-Mayer Distributing Corp. v. Bijou Theatre Co., D.C., 3 F.Supp. 66. There is no merit in this contention of the defendant.

Second, it is argued that the plaintiff's claim to copyright is invalid because the plaintiff-corporation claimed copyright as an author, and a corporation cannot be an author because it is not capable of exercising intellectual labor, nor does it possess the mental endowment necessary to produce photoplays.

It is stated in the certificate of copyright registration that the plaintiff-corporation was the author of the photoplays and that the story and direction of the same was by certain individuals named therein. It is well settled that the protection given to copyright is wholly by statute based on the exercise of the power vested in Congress by the Federal Constitution in Article 1, Section 8, Clause 8, U.S.C.A., "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." In accordance with this power Congress passed the first copyright statute May 31, 1790, 1 Stat. 124, designating the act as "An Act for the encouragement of learning, by securing the copies of maps, charts, and books, to the authors and proprietors of such copies, during the times therein mentioned." Since then many statutes have been passed in connection with this subject and a rather comprehensive statute was passed in 1909 (17 U.S.C.A. § 1 et seq.), later amended in some particulars.

Under Section 8 of the 1909 Act the persons entitled to copyright are: "The author or proprietor of any work, * * or his executors, administrators, or assigns," 17 U.S.C.A. § 8, and in section 62 of the 1909 Act appears the following: "The word 'author' shall include an employer in the case of works made for hire." 17 U.S.C.A. § 62.

Amdur on "Copyright Law and Practice," speaking of the latter section of the statute, states, p. 563: "The act of March 4, 1909 denotes 'an employer in the case of works made for hire' as an 'author' rather than a proprietor."

And further, p. 564: "The significance of designating an employer in the case of works made for hire as an 'author' rather than a 'proprietor,' is that the right of renewal is primarily conferred upon the author. But an exception is made in the renewal sections in favor of one for whom work is done for hire. Had the copyright been acquired by assignment, the assignee would be a 'proprietor' and not an 'author' and would be incapable of obtaining a renewal of his copyright." Sections 23, and 24, Act of 1909, 17 U.S.C.A. §§ 23, 24.

Assuming the corporation in the present case, or any other corporation, is incapable of exercising intellect so as to be primarily entitled to secure copyright, yet it is perfectly plain that a corporation can be "an employer in the case of works made for hire" under the terms of the statute, and entitled to copyright. The certificates of copyright were introduced in evidence by the plaintiff at the trial and there was no evidence to controvert the facts stated in the certificates. Section 55 of the Act of 1909, as amended, 17 U.S.C.A. § 55, provides that a certificate of copyright is prima facie evidence of the facts stated therein, and inasmuch as the plaintiff-corporation was designated as an "author" in these certificates the burden of going forward to disprove this fact was upon the defendant, and inasmuch as it failed to do so the validity of the copy-

530

rights in question here is established. Berlin v. Evans, D.C., 300 F. 677.

A contention is made here by the defendant, in its argument, that Congress exceeded its powers in enacting Section 62 of the Act of 1909, as amended, 17 U.S.C.A. § 62, designating an "author" as an employer in the case of works made for hire. This matter was not relied upon by the defendant in its answer to the plaintiff's substitute declaration filed November 28, 1938. No opportunity was given to the plaintiff to meet this defense nor to the Court to certify to the Attorney General of the United States that the constitutionality of an Act of Congress was brought into question, in order that he might intervene. Chapter 754, § 1, 50 Stat. 75, 28 U.S.C.A. § 401. Although I believe this contention was without foundation, yet it was not open to the defendant on the pleadings.

The defendant next argues that this suit should be abated because it was brought without specific authority of the plaintiff. The facts are to the contrary. The evidence showed that the plaintiff-corporation had knowledge of the violations involved in this suit long before the action was brought. On September 21, 1934, a month before the defendant was notified of the alleged infringement, the general sales manager of the plaintiff-corporation communicated by letter with the manager of the Boston office of the Bureau that they had received certain information as to the violations sued on here, with the request that further information in connection with them be furnished immediately. And the evidence showed, in accordance with the practice that had been established, that the plaintiff was apprised of the suit and that it was going to be tried in Court. The representatives of the legal department of the Bureau asked the plaintiff's assistance in its prosecution, and this was freely given by the plaintiff. It is plain, in view of this and of the practice and understanding existing in connection with settlements and suits and their proceeds that the instant suit was specifically authorized to be brought by the plaintiff-corporation. In addition to this, the above shows ample ratification of the action taken by the Bureau to give the necessary authority.

Assuming the defendant is correct in its contention as to its right to have the instant suit abated because the authority was unlawful in that the Bureau was engaged in barratrous practices, the facts do not justify such a procedure. It is perfectly apparent that the Bureau described above was formulated for the purpose of protecting large business enterprises from illegal trespasses which involve the loss of substantial revenue. Certainly, the producers and distributors have a right to protect their property. The evidence plainly shows that the Bureau is supported by the producers for the protection of their own business interests and all its expenses paid by them. The producers have a right to maintain their investigating agencies in their own manner and to employ legal help to enforce the legal rights which are theirs. Barratry is described in 1 Bouv.Law Dict., Rawles Third Revision, page 327, as "The offence of frequently exciting and stirring up quarrels and suits, either at law or otherwise." And Blackstone described a barrator in volume 4, p. 125, as "those pests of civil society that are perpetually endeavoring to disturb the repose of their neighbors and are officiously interfering in other men's quarrels. * * *" Assuming barratry still to be an offense in Maine and Massachusetts, where the activities complained of here took place, it would be difficult to suppose that the vexatious person or collection of persons that are called common barrators can be found to exist under the above described circumstances. There was no purpose on the part of either the distributors or the Bureau to foment suits in order to oppress persons. Commonwealth v. McCulloch, 15 Mass. 227. And, surely, the definition in Blackstone cannot fit persons engaged in protecting their legitimate business enterprises. Nothing so sinister as this can be found in the arrangement made by the producers for their protection. With the many violations of copyrights secured on motion pictures and the vast number of theatres existing in the United States, it is perfectly apparent that it is necessary for the producers to protect their rights by supporting and keeping in existence an organization such as described here.

Lastly, I cannot find anything to support the defendant's contention that the Bureau was engaged in the unlawful practice of law, assuming if it were so engaged it would be sufficient cause for abatement of the action. It did not sell legal services as was the case In the Mat-

ter of Maclub of America, Inc., Mass., 3 N.E.2d 272, 105 A.L.R. 1360, cited by the defendant. There was no solicitation of employment in legal matters by the Bureau or any of its lawyers. In the instant case the evidence showed that notice of infringement came to the notice of the producer who brought it to the attention of its agents in the Bureau for investigation and report. The plaintiff had a right, as I have said before, to maintain its own investigative department to discover infringements and a legal department to prosecute suits concerning them for the protection of its lawful business. The Bureau it maintained had a direct relation to the latter. The mere fact it created its agency for the above purposes under a trade name does not involve any illegality.

It is my conclusion that the eight copyrights of the plaintiff concerned here are valid and have been infringed by the defendant.

The requests of the parties for rulings of law, so far as they are consistent with the above, are granted, and, to the extent that they differ from the above rulings they are denied.

Judgment is to be entered for the plaintiff in the sum of two hundred fifty (250) dollars for each infringement, together with costs of suit and an attorney's fee of fifteen hundred (1,500) dollars.