WEXLEY v. KTTV, Inc. et al.

No. 12994.

United States District Court
S. D. California, Central Division.

Nov. 24, 1952.

Edward Mosk and Aubrey I. Finn, Hollywood, Cal., for plaintiff.

Irving B. J. Levine and Daniel A. Weber, Beverly Hills, Cal., for defendants KTTV, Inc. and Screencraft Pictures, Inc.

BYRNE, District Judge.

The plaintiff is the author and copyright owner of a play entitled "The Last Mile". On July 21, 1931, he entered into a written agreement with defendants' assignors, whereby rights to deal in motion picture versions of the play were transferred to defendants' assignors. On November 25, 1950, the defendants caused to be broadcast over television station KTTV a motion picture film of the play. Plaintiff claims infringement of his copyright and damages resulting therefrom.

The sole issue in the case is whether the contract of July 21, 1931, transferred to the purchaser the right to *televise* a motion picture produced under the provisions of the contract.

The pertinent provisions of the contract read as follows:

"Third: The owners hereby sell, assign, transfer, set over convey and grant unto the purchaser, its successors, representatives and assigns throughout the world forever the complete, entire and exclusive motion picture rights in and to the said dramatic composition, including but not in limitation all motion picture rights as said rights presently exist, are conceived and understood and as said rights may at any time hereafter exist, be conceived and/or understood in and to the said dramatic composition, its title, plot and theme, including but not in limitation the sole and exclusive right throughout the world to make, produce, adapt, sell, lease, license, sublicense, exhibit, exploit, perform, transmit and otherwise generally deal in motion picture versions of the said dramatic composition and the title thereof in any manner and method now or any time hereafter ever known or made available, * * *.

"Eleventh: The owners hereby reserve for their use, as their interests may appear, all rights not hereby granted to the purchaser, including among other rights but not by way of limitation thereof, production rights on the spoken stage with living actors,

publication rights and television rights unaccompanied by a visual representation of the play, the right to transmit or otherwise make audible and visible performances of the said play direct from living actors in a place other than that in which the actors are physically present. The owners hereby agree, however, not to exercise the right to produce and render visible and audible such performances direct from said living actors not appearing in the immediate presence of their audience within the period of fifteen (15) years from the date hereof. The owners agree, however, that when they shall determine to sell the television rights, they will give the purchaser the right to acquire such rights at the then market value of the same, meaning thereby that the purchaser shall have the right to purchase upon any bona fide offer the owners may determine to accept, there being, however, no obligation upon the owners to sell such right at any time for any price."

■ It will be observed that the owners grant " * * * the sole and exclusive right throughout the world to make * * * exhibit, * * * motion picture versions of the said dramatic composition * * * in any manner and method now or any time hereafter ever known or made available * * *." Television, being a presently known method of exhibiting motion pictures,[1] the right to televise motion pictures is granted unless a limitation or reservation is expressly and clearly imposed.[2]

We now turn to the reservation clause. There are four specific classes of rights reserved, (a) production rights on the spoken stage with living actors, (b) publication rights, (c) television rights unaccompanied by a visual representation of the play, (d) the right to transmit or otherwise make available and visible performances of the said play, direct from living actors in a

place other than that in which the actors are physically present.

There is no dispute regarding (a), (b), or (d). The plaintiff concedes that (d) encompasses only "live action television" and does not include the exhibition of a motion picture on television; but, says the plaintiff, the right to exhibit motion pictures on television is reserved in (c) because a motion picture is not a visual representation of the play. The weakness of the plaintiff's case is disclosed by this contention. That a motion picture of a play exhibited on television is a visual representation of the play cannot be open to question. Every picture, whether motion or otherwise, is a visual representation of the thing it depicts. The use of the word "unaccompanied" in the phrase "television rights unaccompanied by a visual representation of the play" specifically excludes the televising of motion pictures from the television rights reserved by the grantors.

■ Just what uses of television were foreseeable in 1931 is open to conjecture, but conceivably the parties could have contemplated recitals of the play without the picture. That would be an audible representation unaccompanied by a visual representation of the play. We do know that the right to present a visual representation of the play was not reserved under (c) because the parties *so stated in unequivocal words*. The only right to transmit a visible representation of the play by television which was reserved was the right to transmit "live television" as spelled out in (d).

It is significant that, of all of the rights reserved by the grantor, *only the right to transmit "live television" was restricted*. The grantor could not exercise his right to transmit "live television" until the expiration of fifteen years from the date of the agreement. The apparent purpose of this restriction was to protect the grantees' motion picture rights from "live television" competition for a period of fifteen years.

1. Philadelphia Retail Liquor Dealers Association v. Pennsylvania Liquor Control Board, 360 Pa. 269, 62 A.2d 53, 4 A.L.R. 2d 1212 (Supreme Court of Pennsylvania, 1948).

2. See Grant v. Kellogg Co., D.C., 58 F. Supp. 48, 51, and cases therein cited.

560

If we were to disregard the plain import of the term, "visual representation of the play", and accept the plaintiff's contention that the right to, televise motion pictures was reserved under (c), it would lead to an incongruous result. It would mean that the parties intended to protect the grantee from the competition of "live television" for a period of fifteen years, *but placed no restriction on the grantor's right to televise motion pictures.* How illogical it would be to believe that the parties intended the grantor to have the immediate right to exhibit pictures on television while restricting the less competitive "live television" for fifteen years.

The obvious reason for applying the fifteen year restriction "to live television" *only,* was because *it was considered the most serious competition to the exhibition of motion pictures.* If it were intended to leave in the grantor the right to exhibit motion pictures on television, *the parties unquestionably would have applied the fifteen year restriction to such right.* Because the television rights reserved in (c) were in the nature of radio broadcasts unaccompanied by a picture, is precisely why the fifteen year restriction was not attached.

The plaintiff contends that because the grantors warrant that they are the owners of the television rights as well as the motion picture rights and agree "that when they shall determine to sell the television rights, they will give the purchaser the right to acquire such rights", it was their intention to reserve *all* television rights. The fallacy of this reasoning is apparent. *The television rights which were reserved and which they agreed to make available to the purchaser when they determined to sell, were the television rights they spelled out in the reservations clause, viz.: "live television" and television rights unaccompanied by a visual representation of the play.* If it were the intention to reserve all television rights, the parties would have so stated and would not have limited the reservation to television rights *un*accompanied by a visual representation of the play. It is quite obvious that the reason television rights *accompanied* by a visual representa-

tion of the play were not reserved was because such a reservation would conflict with the right granted the purchaser to exhibit motion pictures in "any manner or method now or any time hereafter ever known or made available."

Judgment will be for the defendant. Counsel is requested to prepare and submit findings and judgment in accordance with Local Rule 7.