Abraham N. Geller, J.
This is an action in tort in the nature of libel brought by Victor Seroff, author of the biography “ Rachmaninoff ”, against Simon & Schuster, Inc., his publisher, for damage allegedly done to his reputation as an author resulting from a distorted French translation of his book.
While there are authorities, as indicated herein, regarding the rights of an author in connection with alleged distortion in a domestic publication, neither counsel has cited nor has the court’s independent research disclosed any authority dealing with the subject of a publisher’s obligation and liability as to distortions in a foreign translation of a work previously published in a satisfactory domestic form.
In 1948, several years after the death of Sergei Rachmaninoff, Simon & Schuster commissioned Seroff, an author specializing in biographies of famous musicians, to write a book about the celebrated pianist-composer. The parties entered into a standard publishing contract, which provides: ‘ The Author Agrees: (a) to grant and hereby does grant, bargain, sell, convey, transfer, and set over unto the said Simon & Schuster, Inc., the sole and exclusive right to publish, print and put on the market the said work * * * in book form in the United States of America and in Canada, during the full term of copyright and all renewals thereof, and also grants to the Publisher the further rights hereinafter set forth:”
*385 The contract as to the further rights, also states the following: “additional rights * * * consist of all abridgement, translation * * * and other publication and editorial rights * * *. All revenue derived from the sale of these rights shall be shared equally between the Author and the Publisher * * * ”,
The book was published in 1950 and was favorably reviewed in this country. In accordance with its usual practice, Simon & Schuster sent copies of the book to yarious sales agents in other countries, including a leading sales agent in France. In 1953 a sale was consummated by Simon Sc Schuster through that agent with Editions Robert Laffont, a French publisher, of the exclusive right to publish and sell the book in the French language throughout the world ”. Laffont hired a French translator and published the French version of the book in 1954. The French reviews were also favorable. Simon Sc Schuster’s name does not appear in, nor did it participate in the translation, publication or distribution of the French version.
"When Seroff, who speaks French fluently, was provided with a copy of the printed French book, he protested bitterly to Simon Sc Schuster of what he considered “ a complete distortion of my English version and what is most distressing a flagrant falsification of my original text in the American edition.” He prepared a list of 134 alleged errors, mistranslations, distortions and changes, and also complained of the omission of the preface written by Virgil Thomson, as well as the index listing Rachmaninoff’s musical works and bibliographical writings pertaining to him, which had given a scholarly tone to his book. He insisted that Simon & Schuster demand of Laffont recall of the books already sold and correction of new copies.
Simon & Schuster forwarded his letter to Laffont and asked the latter to take steps accordingly to avoid “ serious harm ”. At this stage Simon Sc Schuster was of the opinion that at least some of the errors “ appear to be quite serious ”. It offered to pay a limited sum to defray, in part, the expenses of a person named by Seroff, who would negotiate personally with Laffont in France in an endeavor to settle the matter, but this offer was rejected by Seroff’s representative as inadequate for the purpose. Finally, when Laffont advised that his “ specialists ” had concluded, after a complete study of Seroff’s complaints, that there were no errors and that he was firmly opposed to making any changes, Simon & Schuster offered to assign to Seroff any claim it might have against Laffont for whatever action Seroff desired to take against the French publisher, *386 advancing to him the afore-mentioned limited sum for that purpose. Instead, Seroff sued Simon & Schuster.
Before reviewing the law, let us dispose of the factual issue of the translation itself. Considerable proof on this subject was adduced by both parties, including the testimony of experts and the submission of various French-English dictionaries. It is quite obvious that there are differences in a number of respects between the two versions. However, it does not necessarily follow that a mistranslation has been committed. A too literal translation would be avoided by any competent translator. There are nuances in one language which must be captured by the craftsman and expressed in the characteristic style of the other language, even though it may entail some deviation from the original. The question then becomes one of discrimination in the choice of the right word or phrase, the goal being to express the idea or mood of the original work in a style appropriate to the subject. In a proper translation, the translator, however, must be content with his role and npt attempt to rewrite, revise or alter the ideas, mood or style of the original.
While most of the claimed errors are of a trivial nature and others not too serious in themselves, there are a few errors which constitute such significant deviations from the original that one is led to believe that the translator may have consciously sought to sensationalize and inject pungent language in order to make the book more attractive to a certain segment of the French public; or the translator, having a tendency in that direction, may have allowed himself free rein to express his own conception of what he believed were the implications in the original work. Probably Seroff, seriously disturbed when he first came across what must have seemed to him a deliberate distortion, reacted by becoming suspicious of every error, however slight, even such innocent slips as phonetic misspellings of Russian names in French.
Still, despite the favorable French reviews, it appears to the court that sufficient has been shown to establish such substantial alteration as would warrant the granting of some relief to an author who was entitled to and interested in the preservation and integrity of his work, if the parties responsible for the alteration of his work were before the court.
Turning to the law, the court recognizes the need to protect authors and others who work with intellectual rather than with tangible property. The court appreciates that the failure of the community, years ago, to protect their gifted men of letters *387 led to tragedies which comprise scars in the history of civilization.
The failure of the English courts of the period of the American Revolution to protect authors resulted in numerous tragedies poignantly described in chapter I of Ball on the Law of Copyright and Literary Property.
The theory upon which Seroff relies in this action is that Simon & Schuster “ caused ” by its acts and omissions the publication of the distorted French version. The precise lines of the theory have not been clearly defined by counsel but the proposed theory would appear to be analogous to what has been called the “ moral right ” of an author or artist to object to any deformation, mutilation or other alteration of his work.
Parenthetically, the term “ moral right”, though widely recognized in civil law countries, is not mentioned in our Copyright Act, nor is it expressly mentioned in the Universal Copyright Convention which came into force in the United States on September 16, 1955.
In the report of the Rapporteur-General Sir John Blake on the Inter-Governmental Copyright Conference in Geneva, wherein on September 16, 1952 the Convention was adopted, there is a direct reference to the desire of delegations ‘ ‘ to avoid reference to ‘ droit moral ’.”
Nevertheless, a right analogous to “ moral right ”, though not referred to as such, has been recognized in this country and in the common-law countries of the British Commonwealth so that in at least a number of situations the integrity and reputation of an artistic creator have been protected by judicial pronouncements. The express grounds on which common-law protection has been given include libel, unfair competition, copyright, and the right of privacy, with some groping toward what Roeder has called “ a tort theory of a personal sui generis nature.” (Martin A. Roeder: The Doctrine of Moral Right, 53 Harv. L. Rev. 554, 576; see, also, Katz: The Doctrine of Moral Right, 24 So. Cal. L. Rev. 375; see: Lee v. Gibbings, 67 L. T. 263; Archbold v. Sweet, 1 M. & Rob. 162; Ben-Oliel v. Press Pub. Co., 251 N. Y. 250; D’Altomonte v. New York Herald Co., 154 App. Div. 453, mod. 208 N. Y. 596; American Law Book Co. v. Chamberlayne, 165 F. 313; Granz v. Harris, 198 F. 2d 585; Packard v. Fox Film Corp., 207 App. Div. 311; De Bekker v. Stokes Co., 168 App. Div. 452, mod. 172 App. Div. 960, affd. 219 N. Y. 573; Prouty v. National Broadcasting Co., 26 F. Supp. 265; Drummond v. Altemus, 60 F. 338.)
*388 However, recognizing the existence of rights in artistic creators to defend themselves against the free or slipshod use of their creations, nevertheless, such rights may be transferred or surrendered by contract. It is the function of the court to determine the respective rights of the parties primarily by the contract that they made.
This is apparent from Judge Seabuby’s decision in the leading case of Clemens v. Press Pub. Co. (67 Misc. 183 [App. Term, 1910]) where, while recognizing (though not by the name of “ moral right ”) a right in authors to have the integrity of their writings protected, he simultaneously recognized the paramount rule of the law of contracts:
“ Even the matter-of-fact attitude of the law does not require us to consider the sale of the rights to a literary production in the same way that we would consider the sale of a barrel of pork. *** "While an author may write to earn his living and may sell his literary productions, yet the purchaser, in the absence of a contract which permits him so to do, can not make as free a use of them as he could of the pork which he purchased.
“ The rights of the parties are to be determined, primarily, by the contract which they make, and the interpretation of the contract is for the court. If the intent of the parties was that the defendant should purchase the rights to the literary property and publish it, the author is entitled not only to be paid for his work, but to have it published in the manner in which he wrote it. The purchaser cannot garble it or put it out under another name than the author’s; nor can he omit altogether the name of the author, unless his contract with the latter permits him so to do.” (Italics added.)
A classic example of a case where the integrity of an author would be protected is Archbold v. Sweet (supra) where Lord Tester,debt held that an author could maintain an action for injury to his reputation against the publisher of a revised edition under the author’s name of a work on criminal law, notwithstanding the ownership of the copyright in the publisher, where an employee of the publisher was responsible for errors appearing in the revised edition.
The control of “ moral right ” by the law of contracts under the present state of the law was accurately, though somewhat colloquially stated, by the late Prof. Zechariah Chafee, Jr., in Reflections on the Law of Copyright: II (45 Col. L. Rev. 719, 729): “ For the time being, we had better concentrate our energies on the pecuniary aspects of copyright. We have enough trouble there. After we get the issues of dollars and cents *389 settled satisfactorily, we can go on to moral rights. * * * Meanwhile any copyright owner who really cares about his moral rights can always protect them by inserting appropriate clauses in his contracts with publishers and producers, for example, by expressly forbidding any alterations or omissions made without his consent. He can do this until the copyright expires.”
Plaintiff’s right to some relief under a right analogous to a “moral right” being established, we turn then to the question of this defendant’s duty with relation to that right under the contract between the parties.
The limits of that duty are contained in the contract of the parties and the implicit obligation arising therefrom. Seroff granted to Simon & Schuster the “additional” rights of translation and foreign publication, with the added proviso that all revenue derived from the “ sale ” of these rights was to be shared equally between them.
This would appear on its face to be an agreement between Seroff and Simon & Schuster to embark on a joint venture in regard to such “ additional ” rights, with Simon & Schuster to be the agent for the parties and under the normal obligations of a party acting in such capacity. We will discuss these obligations below.
Even assuming arguendo that this result would not be conclusively reached from a review of the contract per se, the established principles for interpreting a contract would lead to this same conclusion in the case at bar. Such established principles are set forth in Horby Realty Corp. v. Yarmouth Land Corp. (270 App. Div. 696, 697): “ Parol evidence is admissible to explain the meaning which custom or usage has given to words or terms as used in any particular trade or business or in any particular locality. (Newhall v. Appleton, 114 N. Y. 140, 144; Gumbinsky Bros. Co. v. Smalley, 203 App. Div. 661, 667, affd. 235 N. Y. 619; Lipson v. Bradford Dyeing Assn., 266 App. Div. 595, 597; 3 Williston on Contracts [Rev. ed.], § 650; 1 Greenleaf on Evidence [16th ed.], § 295.) ”
The evidence showed the existence of a trade practice followed by American publishers of the sale of foreign rights directly or through sales agents to foreign publishers, and the nonexistence of any trade practice in connection with such sales calling for supervision by the American publishers of the foreign translations prior to their publication.
It appears that Seroff was familiar with this trade practice. His previous book “ Shostakovitch ” had been translated into Spanish and Portuguese, and his “The Mighty Five” had *390 been translated into French. On neither of these books was he consulted about the foreign editions, nor did he see copies before the books appeared. Thus, Seroff knew, or should have known, that Simon & Schuster would handle the book exactly as it did.
Accordingly, there is no merit to plaintiff’s contention that Simon & Schuster were remiss in their duty to bim in failing to make provision in the sales contract with Laffont for the submission of a copy of the proposed French edition prior to its publication. Seroff must be deemed to have contemplated a “ sale ” of the foreign rights by Simon & Schuster in accordance with the practice of the publishing trade, absent any qualifications or directions concerning the “ sale ” in his publishing contract'. The situation would have been different had there been inserted specific provisions, such as that Simon & Schuster were to supervise the accuracy of translations or that Seroff was to have that right prior to foreign publication.
However, as Indicated above, the relationship established by the publishing contract concerning these “ additional rights ” was that of joint venture between Simon & Schuster and Seroff, with the former the active representative. This imposed upon Simon & Schuster the obligation to make a proper selection of prospective purchasers of Seroff’s brain child. ’ The evidence conclusively showed that this obligation was completely fulfilled in the sale to Laffont. His reputation as a fine publisher was unimpeached. Included among his French editions are books by writers of such standing as Winston Churchill, Dwight D. Eisenhower, John Steinbeck and J. P. Marquand. It is unnecessary to determine whether any further duty devolved upon Simon & Schuster to take any steps to correct the situation after the mistranslations had been accomplished. No such issue is here raised or involved, or for which relief has been requested. It has been noted that it did take some steps in that direction, although without conceding any obligation therefor.
Plaintiff’s entire case rests on the assumption that Simon & Schuster “ caused” the distorted French version, and was therefore responsible for the libel thereby produced upon his reputation as an author. It is true that “Asa general rule, all persons who cause or participate in the publication of libelous or slanderous matter are responsible for such publication ’ ’; but it must be shown “ that the publication or participation of the person sought to be held liable related to the defamatory matter published, and not simply to the general communication of which the defamatory matter was a part.” (53 C. J. S., Libel *391 and Slander, § 148). Thus, it has been held that when one sends some unobjectionable written material or information to another who distorts it into a “ libel ”, the original party cannot be held responsible therefor (Howland v. Blake Mfg. Co., 156 Mass. 543; Klos v. Zahorik, 113 Iowa 161; Haggard v. First Nat. Bank of Mandan, 72 N. D. 434). The situation would, of course, be different if one’s own agent or employee had committed the distortion, since a principal or employer is responsible for the negligent or unskillful acts of his agent or employee. But Laffont is clearly not an agent of Simon & Schuster; he is a wholly independent publisher who bought the French rights, and is in fact an independent contractor.
Whatever the rights plaintiff may have against Laffont or the French translator, it is clear that he may not succeed against Simon & Schuster in this action to recover damages for injury to his reputation produced by the French version.
In view of this disposition, it is unnecessary to discuss the problem of damages or to determine whether special damages must be established in this kind of case.
Defendant is accordingly entitled to judgment dismissing the complaint. All motions upon which decision was reserved, except defendant’s motion for judgment at the close of the entire case, are denied.
This constitutes the decision of the court in accordance with section 440 of the Civil Practice Act.