**Margaret M. LANDON, Plaintiff,**

v.

**TWENTIETH CENTURY–FOX FILM CORPORATION and Columbia Broadcasting, Inc., Defendants.**

**No. 74 Civ. 518.**

United States District Court,
S. D. New York.

Nov. 13, 1974.

Layton & Sherman, New York City, Robert Layton, New York City, of counsel, Arnold & Porter, Washington, D. C., Mitchell Rogovin and James A. Dobkin, Washington, D. C., of counsel, Herbert A. Fierst, Washington, D. C., for plaintiff.

Rogers & Wells, New York City, for defendants; Youngman, Hungate & Leopold, Los Angeles, Cal., and William R. Glendon, Stephen R. Froling, New York City, of counsel.

## MEMORANDUM AND ORDER

LASKER, District Judge.

In 1944 Margaret Landon entered into an agreement with Twentieth Century-Fox Film Corporation (Fox) to sell, among other things, "motion picture rights" to her book entitled "Anna and the King of Siam". In 1972 Fox produced 13 films which were broadcast on the CBS Television network as a weekly serial entitled "Anna and the King."

This suit presents the question whether the 1944 agreement between Landon and Fox authorized Fox to produce and exhibit the 1972 series through defendant CBS. In addition to her assertion that the series infringed her copyright in the literary property "Anna and the King of Siam," Landon raises the novel claim that the 1944 agreement constituted a tying arrangement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, on the grounds that Fox allegedly acquired the original copyright "on condition that" it also acquire the copyright renewal rights. She also argues that the assignment of the renewal copyright is unenforceable for lack of consideration. Landon's final claim is that production and exhibition of the television series constituted tortious misconduct on the part of defendants, that

is, defamation, invasion of her right of privacy, misappropriation of literary property and wrongful attribution to Landon of credit for the series, which she claims to have "mutilated" her literary property.

Landon moves for summary judgment only as to the infringement claim (Count I of the complaint). Defendants move for summary judgment as to all claims against them, and to amend their answer to assert, as an affirmative defense to the antitrust count, the expiration of the applicable four year statute of limitations.

### I.

The heart of Landon's contention that the series infringed her copyright is that the granting language of the 1944 agreement gave Fox the right to produce only motion pictures of feature length intended for first exhibition in movie theaters, and not those intended for first exhibition on television. The grant clauses of the agreement provide, in relevant part:

"FIRST: The Owner does hereby grant, convey and assign unto the Purchaser, its successors and assigns forever:

(a) The sole and exclusive motion picture rights and motion picture copyright throughout the world in and to said literary property.

\* \* \* \* \* \*

(c) The sole and exclusive right to make, produce, adapt, sell, lease, rent, exhibit, perform and generally deal in and with the copyright motion picture versions of said literary property, with or without sound accompaniment and with or without the interpolation of musical numbers therein, and for such purposes to adapt one or more versions of said literary property, to add to and subtract from the literary property, change the sequence thereof, change the

title of said literary property, use said title, or any of its components, in connection with works or motion pictures wholly or partially independent of said literary property, change the characters in said literary property, change the descriptions of the said characters, and use all thereof in new versions, adaptations and sequels in any and all languages, and to register and obtain copyright therein, throughout the world.

\* \* \* \* \* \*

(f) The sole and exclusive right to broadcast by means of the method generally known and described as television, or any process analogous thereto, any of the motion picture versions of said literary property produced pursuant hereto. The Owner specifically reserves to herself the right to broadcast the literary property by television direct from living actors; provided, however, that the Owner agrees that, for a period from the date hereof until eight (8) years after the date of general release of the first motion picture produced by the Purchaser based upon the literary property, or until ten (10) years after the date hereof, whichever period first expires, she will not exercise or grant the right to broadcast the literary property, or any part thereof, by television, or by any other device now known or hereafter to be devised by which the literary property may be reproduced visually and audibly for an audience not present at a performance thereof and with living actors speaking the roles thereof. The Owner grants to the Purchaser the exclusive option to license, lease and/or purchase said reserve rights to broadcast the literary property

by television from living actors, or otherwise, at the same price and upon such bona fide terms as may be offered to the Owner by any responsible prospective buyer and which shall be acceptable to the Owner.

(g) The right to broadcast by means of radio processes, portions of said literary property, or the motion picture version or versions thereof, in conjunction with or exploitation of or as an advertising medium or tie-up with the production, exhibition and/or distribution of any motion picture based on said literary property, provided that, in exercising said radio broadcasting rights, Purchaser shall not broadcast serially an entire photoplay produced hereunder. Except as herein stated, the Owner agrees that she will not permit the said literary property or any part thereof to be broadcast by any method or means until two years after the general distribution date of the first motion picture made by the Purchaser based upon the said literary property, or four years after the date hereof, whichever period first expires. This restriction on broadcasting, however, shall not in anyway affect or restrict the rights on television herein granted.

(h) The right to publish, copyright or cause to be published and copyrighted in any and all languages, in any and all countries of the world, in any form or media (including, but not limited to, press books, press notices, trade journals, periodicals, newspapers, heralds, fan magazines and/or small separate booklets) synopses revised and/or abridged versions of said literary property, not exceeding 7,500 words each, adapted from the said literary

property or from any motion picture and/or television version thereof, with or without sound accompaniment, produced, performed, released or exhibited pursuant hereto."

It is evident that the grant clauses are broadly drafted and do not contain or suggest the purported distinction between motion pictures made for first exhibition on television and those made for theater presentation. Clause (c) expressly grants to Fox the sole right to "make" and "generally deal in" an apparently unlimited number of "motion picture versions" of the property. It confers the right to use and modify the plot, characters and title in "new versions, adaptations, and sequels," again without apparent limit on the number of such versions. Clause (f) cedes the "exclusive" right to broadcast on television "any of the motion picture versions" of the property produced pursuant to the agreement.

The broad construction of the phrase "motion picture versions" to include the 1972 series is confirmed by related provisions of the agreement. These indicate that when the parties sought to reserve to Landon certain rights, they did so carefully and specifically. Such reservations are themselves strong evidence that if Landon had intended to reserve the right to make and exhibit filmed television versions of the property, she and her noted and experienced literary agents, the William Morris Agency, knew how to do so. For example, Clause (g) gives Fox the right to broadcast by radio portions of the property for advertising or promotional purposes, but by express language states that Fox "shall not broadcast serially an entire photoplay . . ." Significantly the provision states that "[t]his restriction on broadcasting . . . shall not in any way affect or restrict the rights on television herein granted." Clause (f), the television clause, specifically reserves to Landon the right to "broadcast the literary property by television direct from living actors," but contains a covenant

providing that she shall not exercise even that limited right for a period of years. In view of this covenant obviously drafted to protect Fox from Landon's competition with Fox's own films, it is far-fetched to believe that the parties so carefully restricted Landon's right to exhibit live television performances only to leave her completely free to show an unlimited number of filmed television versions of the property. The construction Landon seeks was squarely rejected in Wexley v. KTTV, Inc., 108 F.Supp. 558 (S.D.Cal.1952), aff'd, 220 F.2d 438 (9th Cir. 1955), in which the court considered almost identical contractual provisions and stated:

The obvious reason for applying the fifteen year restriction 'to live television' *only,* was because *it was considered the most serious competition to the exhibition of motion pictures.* If it were intended to leave in the grantor the right to exhibit motion pictures on television, *the parties unquestionably would have applied the fifteen year restriction to such right."* 108 F.Supp. at 560 (emphasis in original.)

Moreover, assuming *arguendo* that Landon did indeed reserve the right to *exhibit* motion pictures on television, she had no right to make or produce them: Clauses (h) and (c) clearly grant to Fox the "sole and exclusive" right to "make, produce, adapt . . . exhibit, perform and generally deal in motion picture versions."

We conclude that the only reasonable construction of the 1944 agreement is that Fox was granted the right to make an unlimited number of motion picture versions of the property, without limitation as to length, or place of first exhibition. This conclusion is consistent with the law in this Circuit as to the interpretation of copyright grants. Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150 (2d Cir.) cert. denied, 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968) is precisely in point. There the copyright owners of a musical play assigned to Bartsch in 1930 the "motion

picture rights" in the play together with the right to "copyright, vend, license and exhibit" motion picture photoplays throughout the world. There was no television clause in the assignment. Later in 1930, Bartsch assigned his rights to Warner Brothers, which in turn transferred its rights to MGM. MGM produced and distributed a feature-length motion picture based on the musical play in 1935. In 1958 MGM licensed the picture for exhibition on television and Bartsch's widow, to whom his copyright interest had devolved, sued to enjoin the broadcast. The issue was comparable to ours: whether, under the terms of original grant by the copyright authors to Bartsch in 1930, (and then from Bartsch to Warner) the right to "copyright, vend,' license and exhibit . . . motion picture photoplays" included the right to license a broadcaster to exhibit the picture on television without a further express grant by the copyright owner (Bartsch). In deciding that the grant did include such a right, Judge Friendly emphasized that Bartsch's assignment to Warner was "well designed to give [Warner] the broadest rights" with respect to the right to produce motion pictures, and noted that " '[e]xhibit' means to 'display' or to 'show' *by any method,* and nothing in the rest of the grant sufficiently reveals a contrary intention." 391 F.2d at 154 (emphasis added). The court stated the rule which controls the present case:

> "As between an approach that 'a license of rights in a given medium (e. g., 'motion picture rights') includes only such uses as fall within the unambiguous core meaning of the term (e. g., exhibition of motion picture film in motion picture theaters) and exclude any uses which lie within the ambiguous penumbra (e. g., exhibition of motion picture film on television)' and another whereby 'the licensee may properly pursue any uses which may reasonably be said to fall within the medium as described in the license,' [Professor Nimmer] prefers

the latter. So do we . . . If the words are broad enough to cover the new use, it seems fair that the burden of framing and negotiating an exception should fall on the grantor; if Bartsch or his assignors had desired to limit 'exhibition' of the motion picture to the conventional method where light is carried from a projector to a screen directly beheld by the viewer they could have said so." 391 F.2d at 155.

There was no question in *Bartsch* that the parties were aware of the possibilities of television even in 1930. In the present case, involving a 1944 agreement, there is, of course, no question on that score either; the Landon contract is sprinkled with references to television and one does not have to roam far into the penumbral meanings of "motion picture versions" to conclude that the term was intended by the parties to embrace rather than exclude the right to produce a television series. Indeed, Clause (h) of the agreement, (to which, curiously, the parties pay only passing attention) expressly refers to "any motion picture and/or television version . . . produced, performed, released or *exhibited pursuant hereto.*" (emphasis supplied)

Goodis v. United Artists Television, Inc., 425 F.2d 397 (2d Cir. 1970) also supports our conclusion that the 1944 agreement authorized the 1972 television series. In 1945 Goodis, the author of the novel "Dark Passage," sold the exclusive "motion picture rights" to Warner Brothers, which produced and subsequently televised a feature motion picture with the same title. In 1956 Warner assigned its rights to United Artists, which produced the popular television serial "The Fugitive". Goodis brought suit in 1965 claiming that the exhibition of the serial infringed his copyright because it was outside the scope of the grant in the Goodis-Warner Brothers agreement.

In pertinent part, the contract conferred "the exclusive, complete and entire motion picture rights" and "the right to broadcast and transmit any photoplay

produced hereunder by the process of television . . . ." The district court granted defendant's motion for summary judgment on the basis of the broad granting language. In reversing the decision, the Court of Appeals emphasized the absence in the agreement of an affirmative and explicit grant of the right to make "sequels" (i. e. subsequent stories employing the same characters in different plots or sequences) and observed:

> "[I]t would be rash of us to hold on summary judgment that the sale of rights in one of an author's works ends, without specific mention that it ends, the author's exclusive ownership of the valuable characters he created in that one work, when he may well desire to create sequels of his own using these same characters."
> 425 F.2d at 406.

*Accord,* Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, 216 F.2d 945 (9th Cir. 1954), cert. denied, 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756 (1955).

■ Significantly, the right to make "sequels," critically absent in *Goodis,* is explicitly expressed in the language before us. Clause (c) of the agreement recites the usual "additions" and "alterations" provisions in regard to adapting the property to the film medium and then grants the "sole and exclusive right" to use the property in "new versions, adaptions and sequels . . . and to register and obtain copyright therein, throughout the world." Such broad language, particularly when read in combination with the grant in Clause (f) of the "sole and exclusive right" to broadcast on television "any of the motion picture versions" which the contract gives Fox the "sole and exclusive" right

to make (Clause (c)), leads inescapably to the conclusion that Fox is entitled to summary judgment on the infringement claim.

■ We have carefully considered Landon's argument that, at the least, the presence of genuine issues as to material facts precludes the grant of summary judgment to Fox. Apart from the fact that such an assertion is undercut by her own motion for similar relief, the argument is without merit. Landon contends first that Fox's contracting practices as reflected in a number of other agreements drafted during the 1940's demonstrate that Fox often and explicitly contracted for the right to produce "television versions," and that its failure to do so here is probative of its intent as to the 1944 agreement. The contention is effectively rebutted by the undisputed facts that (1) Fox maintained both East coast and West coast legal departments, each with its own drafting style, and (2) Landon's contract was drafted in the office which, as a matter of consistent practice, did not use the magic words "television versions" to acquire the rights in issue here, relying instead on general language to achieve the same result.[1] In any event, contracts made between Fox and other copyright owners have little probative value as to what Fox and Landon intended in their particular agreement, see Bartsch v. Metro-Goldwyn-Mayer, *supra,* 391 F.2d at 154–155.

■ Landon also contends that "motion picture versions" is a term of art whose meaning can be established only by extrinsic "technical evidence." It is, of course, a familiar principle that where the terms of a contract are ambiguous, such evidence may be introduced, not to vary the meaning of

[1] Landon's submissions on the present motions include as exhibits a group of Fox contracts (the Exhibit F contracts) in which the granting clause contains language granting to Fox the right to make "motion picture and television versions" of a literary property. The "F" contracts wre drafted by the Fox West coast legal department in Los Angeles.

Landon contrasts those contracts with another group of contracts (the Exhibit E contracts) which, like the agreement in issue here, do not include the phrase "television versions." However, it is undisputed that the "E" contracts were all prepared by the Fox East coast legal department.

a contract but to establish the intent of the parties. But in the context here, the terms of the contract are not ambiguous and do not raise a triable issue of fact.

We note, parenthetically, that both the copyright law, 17 U.S.C. § 5, and related regulations, 37 C.F.R. § 202.15, and the Copyright Office publication, The Compilation of Copyright Office Practices (1973 ed., at ¶ 2.14.1, p. 2–573) define "motion picture" to include "filmed television plays" or filmed pictures "transmitted by means of television," respectively. The relevant case law bears out these definitions. See, e. g., Goodis v. United Artists Television, Inc., 278 F.Supp. 122, 126 (S.D.N.Y. 1968), rev'd on other grounds, 425 F.2d 397 (2d Cir. 1970), Hollywood Plays, Inc. v. Columbia Pictures Corp., 77 N.Y.S.2d 568, 576 (Sup.Ct.N.Y.Co. 1947) aff'd, 274 App.Div. 912, 83 N.Y.S. 2d 302 (1st Dept. 1948) rev'd on other grounds, 299 N.Y. 61, 85 N.Y.S.2d 865 (1949), Vitaphone Corp. v. Hutchinson Amusement Co., 28 F.Supp. 526 (D.Mass 1939), Autry v. Republic Productions, Inc., 213 F.2d 667 (9th Cir. 1954), cert. denied, 348 U.S. 858, 75 S.Ct. 83, 99 L.Ed. 676 (1954).

Plaintiff also argues that it was not her intention to grant to Fox the right to make television versions of the property. She takes the position that her intentions in 1944 present an issue of disputed fact requiring a trial on the merits. The argument is wide of the mark for two reasons. First, it is axiomatic that evidence of plaintiff's intent is admissible only insofar as it was expressed to Fox. Her affidavit is silent on the question whether she ever expressed to Fox in 1944 the construction of the agreement she presses on the present motions, and it is undisputed that she had very little, if any direct contact with Fox at all. Albert B. Taylor, an executive with William Morris Agency (plaintiff's literary agents) with some familiarity with the negotiation of the 1944 agreement, does not state that he, or any other employee of the Agency communicated Landon's

understanding of the agreement to Fox. More to the point, the opposing affidavit of Helen Strauss, who was personally responsible for plaintiff's account and for negotiation on Landon's behalf of the Fox agreement, states that in 1944 Strauss understood the agreement to convey to Fox all film rights, including television rights, while reserving to Landon "dramatic rights," including the right to televise a "live" dramatic rendition of the property.

In sum, there is no genuine issue as to any material fact and defendants are entitled to summary judgment as to the infringement claim.

II.

■■ The second count of the complaint alleges as an unlawful tying arrangement Fox's requirement that it acquire the renewal copyright as a condition to its purchase of the original copyright. As plaintiff concedes, there is no reported case recognizing such a cause of action. Assuming, without deciding, that such an arrangement may violate the anti-trust laws, the particular claim asserted here is fatally deficient. As the Second Circuit has recently stated, the exercise of actual coercion by the defendant (as distinguished from the mere presence of market power) is a necessary element of an unlawful tying arrangement. See Capital Temporaries, Inc. of Hartford v. The Olsten Corporation, 506 F.2d 658 (2d Cir. 1974) and cases cited there; cf. Ford Motor Co. v. United States, 335 U.S. 303, 316–320, 69 S.Ct. 93, 93 L.Ed. 24 (1948), As we read *Capital Temporaries,* to state a valid claim plaintiff would have to allege that (1) she wished to sell only the original copyright at the time she signed the 1944 agreement, (2) expressed that fact to Fox, and (3) that sale of the renewal copyrights was forced upon her by virtue of the superior economic strength or market dominance of Fox. However, neither the complaint nor any supporting affidavit suggest the presence of these elements. Indeed, the contrary appears: Landon testified at her deposition (at p. 266) in connection

with the question of copyright renewals that she did not have any discussion "at all" on that subject at the time the agreement was negotiated. Neither her own affidavit on the present motion nor those of her literary agents refer to any such discussions or any proposed modification of the draft agreement in connection with renewals.

As to Fox's market dominance, the record indicates that Landon's agents offered the literary property to various theater companies and film companies but that Fox was the "only film company to make an offer, despite efforts on my part to secure offers from other film companies." (Opposing Affidavit of Helen Strauss, at Paragraph 5). Although Fox, as the only interested buyer may have been in a position to drive a hard bargain with Landon, the exercise of such power is not the kind of conduct proscribed by the antitrust laws, and indeed there is no evidence that Fox exercised it all. Indeed the Strauss affidavit (Paragraph 5) states that "Anna and the King of Siam" was, as a factual work rather than a novel, not an easily saleable property but that Fox paid "a good purchase price" for it.

■ Moreover, even if plaintiff's claim of an unlawful tying arrangement were otherwise sufficient, it would be barred by the four-year Statute of Limitations in 15 U.S.C. § 16(b). Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 rehearing denied, 401 U.S. 1015, 91 S.Ct. 1247, 28 L.Ed.2d 552 (1971) on which plaintiff relies, is not to the contrary. The holding in Zenith and the other "tolling" cases relied on by plaintiff is that future damages are often incapable of proof in the context of a continuing conspiracy to violate the antitrust laws, 401 U.S. at 338, 91 S.Ct. 795, both because a plaintiff is legally injured by each act of the defendants in furtherance of the scheme and because of the complex market analysis involved in the damage calculation. 401 U.S. at 341–342, 91 S.Ct. 795.

In the present case, however, the alleged violation arises from a single act—the 1944 agreement—by a single defendant. As a general rule, claims based on anti-competitive agreements to which the plaintiff is a party accrue at the time of their execution. Skouras Theatres Corp. v. R.K.O. Corp., 193 F.Supp. 401, 406 (S.D.N.Y.1961), Muskin Shoe Co. v. United Shoe Machinery Corp., 167 F.Supp. 106 (D.Md.1958), Fleischer v. A. A. P., Inc., 180 F.Supp. 717 (S.D. N.Y.1959), aff'd, 329 F.2d 424 (2d Cir. 1964), cert. denied, 379 U.S. 835, 85 S.Ct. 68, 13 L.Ed.2d 43 (1959). The facts at hand fall within this general rule rather than the exception carved out by the Zenith line of cases because the alleged damages were capable of proof at the time the cause of action accrued. The value of the renewal rights to commence in 1972 may have been difficult to calculate in 1944, but it was not impossible to do so. It is not unusual to assign the renewal rights at the commencement of the original copyright term and such agreements have been upheld as valid and enforceable, Fred Fischer Music Co. v. M. Witmark & Sons, 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943), Rose v. Bourne, Inc., 279 F.2d 79 (2d Cir. 1960) affirming 176 F.Supp. 605, 611–612 (S.D.N.Y.1959). The fact that the parties to such agreements are able to place some ascertainable present value on an expectancy interest in the renewal copyright to come into being twenty-eight years later is strong evidence that future damages flowing from an illegal tying arrangement involving the renewal rights can be calculated with reasonable certainty at the time of the original assignment. Our conclusion is supported by the fact that in cases involving an attack on the adequacy of consideration as to renewal rights, such adequacy is determined as of the time of the original transfer. Rose v. Bourne, Inc., supra, 279 F.2d at 80–81 affirming 176 F.Supp. 605, 611–612 (S.D.N.Y. 1959); Fred Fischer Music Co. v. M. Witmark & Sons, Inc., supra; Rossiter

v. Vogel, 148 F.2d 292 (2d Cir. 1945). In any event, even accepting plaintiff's argument that no estimate of future damages was possible in 1944, when the contract was executed, plaintiff certainly knew by the mid-1950's, after the production of two successful feature films and an enormously popular musical play ("The King and I"), that damages flowing from her alleged loss of renewal rights were ascertainable. Even under the *Zenith* rule, the statute of limitations is tolled only until the plaintiff is able to prove future damages with reasonable certainty. Poster Exchange, Inc. v. National Screen Service Corp., 456 F.2d 662 (5th Cir. 1972). Because plaintiff's claim accrued, at the very latest, by the late 1950's, it is time-barred.

### III.

 Plaintiff incorrectly claims that the assignment of renewal rights in the 1944 agreement is unenforceable for lack of consideration. The agreement (at Article II) states that Fox shall pay $67,500 "in full consideration of the rights herein granted and assigned to [Fox]." The law is settled that both original and renewal copyrights may be assigned in consideration of a single lump sum payment, without allocation. Fred Fischer Music Co. v. M. Witmark & Sons, *supra*; Rose v. Bourne, Inc., *supra*.

### IV.

Landon's final claim charges that certain episodes in the 1972 television series "fail to retain and give appropriate expression to the theme, thought and main action of plaintiff's work," resulting in damage to her privacy and reputation and the literary property itself. (Complaint, Paragraph 24) As fleshed out by the material in support of her motion, the basis of this allegation is that her book was a serious literary work concerned with the struggle for human rights, whereas the television series was light in tone, and punctuated with bursts of dubbed laughter from the audience.

It is undisputed that the television credits stated that the scripts were "based on" plaintiff's literary property, with screenwriting credit given to the actual authors of the series in the same titles as Landon's name appears.

 For several reasons, the claim is insufficient as a matter of law. Even without permission from an author or the existence of a written agreement with him, any person may truthfully state that a work is "based on" or "suggested by" the work of that author. I Nimmer, Copyright, § 110.41 at p. 447; Geisel v. Poynter Products, Inc., 295 F. Supp. 331, 353 (S.D.N.Y.1968). Although plaintiff would have a valid claim against defendants if they had falsely attributed the authorship of the series to her, see Granz v. Harris, 198 F.2d 585, 589 (2d Cir. 1952), her claim must fail where, as here, she contracted to (1) *require* Fox to give her appropriate credit "for her contribution to the literary material upon which such motion pictures shall have been based" (1944 Agreement, Article X); and (2) grant Fox the right to:

"reproduce . . . spoken words taken from and/or *based on* the text or theme, of said literary property . . . in . . . motion pictures, using for that purpose all *or a part of the theme,* text and/or dialogue contained in said literary property."

\* \* \* \* \* \*

[and]

"adapt one or more versions of said literary property, to add to and subtract from the literary property, change the sequence thereof, change the title . . . in connection with works or motion pictures *wholly or partially independent of said* literary property . . . *change the characters* . . . change the *descriptions of the said characters,* and use all thereof in new versions, adaptations and sequels . . . ." (Agreement, Article I, paragraphs (b), (c)). (emphasis added)

These provisions clearly grant Fox the right to alter the literary property substantially and to attribute to plaintiff credit appropriate to her contribution. Accordingly, we find that Fox did not violate the agreement or engage in tortious conduct when it truthfully stated that the series was "based on" the property. See Shostakovitch v. Twentieth Century-Fox Film Corp., 196 Misc. 67, 80 N.Y.S.2d 575 (Sup.Ct.N.Y.Co.1948), aff'd, 275 App.Div. 692, 87 N.Y.S.2d 430 (1st Dept. 1949). Seroff v. Simon & Schuster, 6 Misc.2d 383, 388, 162 N.Y.S. 2d 770 (Sup.Ct.N.Y.Co.1957), aff'd, 12 App.Div.2d 475, 210 N.Y.S.2d 479 (1st Dept. 1960).[2]

Plaintiff's motion for summary judgment is denied; defendants' motion to amend their answer is granted; defendants' motion for summary judgment dismissing the complaint is granted.

It is so ordered.

---

**2.** We note in passing that Landon's complaint, a judicial admission, alleges at Paragraph 19 that "Defendant Fox did produce and make available to defendant CBS a series of television programs *based upon* the book" (emphasis supplied). The fact that plaintiff's own choice of language to describe her contribution to the series is almost identical to the wording of Fox's titles, supports our conclusion Fox fairly and accurately credited her.