HAROLD FRIEDMAN INC., Appellant,

v.

THOROFARE MARKETS INC. and Union Real Estate Company.

No. 78–1094.

United States Court of Appeals, Third Circuit.

Argued Sept. 6, 1978.

Decided Nov. 13, 1978.

---

Melvin L. Moser, Jr., Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for appellant.

Donald E. Seymour, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for appellee, Thorofare Markets, Inc.

David R. Levin, Pittsburgh, Pa. for appellee, Union Real Estate Co.

Before SEITZ, Chief Judge, and ADAMS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This is an appeal from a grant of summary judgment in an antitrust suit brought by the owner of a supermarket against its principal competitor and against the managing agent of a shopping center, alleging a combination by them to eliminate plaintiff from the shopping center. The district court held that the jurisdictional requirement that there be a substantial effect on interstate commerce had not been satisfied, and that in any event the action was barred under the applicable statute of limitations. Because we disagree with both conclusions reached by the trial court, and inasmuch as we deem summary judgment inappropriate under the circumstances, we shall direct that the district court's order be vacated.

### I.

Plaintiff, Harold Friedman, Inc. (Friedman), operates seven "Foodland" supermarkets in the Butler County area of Pennsylvania under a franchise from Fox Grocery Company. Defendant Thorofare Markets, Inc. (Thorofare), owns and operates a chain of approximately seventy-five supermarkets in Pennsylvania, West Virginia and Ohio. Since at least 1956, defendant Union Real Estate Co. (Union) has acted as the managing and leasing agent for the owners of the Bon Aire Shopping Center, located in Butler County.

Thorofare opened a supermarket at the Bon Aire Shopping Center in 1949. In 1954, Thorofare moved from the area that it had occupied to larger premises in the same shopping center. Thereafter, Thorofare's lease was amended on May 14, 1956, to include a provision prohibiting the leasing of any part of Bon Aire Shopping Center or adjacent property owned by the lessor to a chain supermarket that would compete with Thorofare.[1]

The area that Thorofare had vacated was rented to Friedman in 1957 under a fifteen-year lease expiring June 30, 1972. Thorofare expressly authorized the lease, and reference was made to such authorization in Friedman's lease.[2] In the ensuing years Friedman and Thorofare competed vigorously with one another.

When its lease at the Bon Aire Shopping Center expired in 1968, Thorofare was permitted to continue its tenancy on a monthly basis, while Union negotiated with both Thorofare and Friedman with respect to the premises occupied by Thorofare. Union sought a major financial commitment toward renovating the premises from the potential lessee. Thorofare obtained the new lease on July 30, 1971, and in return for its financial undertaking, it was granted the right to exclude from the Bon Aire Shopping Center all competitors, including Friedman, after June 30, 1974. This exclusivity right resembled similar provisions that Thorofare had secured in most of its leases at other locations. On November 16,

1. A rider executed on May 14, 1956 substituted the following language for an earlier restrictive covenant that had prohibited leasing space to a competitor within 500 feet of Thorofare's store:

 . . . at no time during the term of this lease shall any portion of this Shopping Center, or any additional property that may be acquired adjacent thereto be leased to a chain super market handling food products of a nature competitive with the Lessee, however, permission is granted to lease the old store room in the Shopping Center formerly occupied by the Lessee to an independent party, nevertheless such independent party may not have the right to lease said former store room to any chain super market or any other independent handling food products of a nature competitive with that of the Lessee. Appendix at 411a.

2. Paragraph 11 of the rider to Friedman's lease stated: "A copy of the authorization from Thorofare Markets, Inc. to the Lessor or the agent of the Lessor to rent the demised premises has been received by the Tenant named herein." Appendix at 85a.

1971, Friedman was given a two-year extension of its Bon Aire lease, to run from July 1, 1972 through June 30, 1974.

The parties disagree as to when Friedman became apprised of Thorofare's exclusivity right. Thorofare contends that Friedman knew, at least constructively, by November, 1971, and that the purpose of the two-year extension of Friedman's lease was to permit Friedman sufficient time to relocate its Bon Aire unit.[3] Friedman's board chairman, on the other hand, testified in a deposition that he had not been aware of the exclusivity provision in the Thorofare lease until late 1973 or early 1974. Further, he stated that he had been continually assured by Union until late 1973 that Friedman's lease would be renewed.[4]

At some point, Friedman began searching for a more spacious site to which it might relocate its establishment, and it finally settled on a location at a shopping center about one and one-half miles north of Bon Aire. Construction plans were drawn up by the end of 1972, but unanticipated factors delayed completion of the new store. In May, 1974, Friedman requested a four-month extension of its Bon Aire lease. Union relayed the request to Thorofare, and Thorofare declined to waive its exclusivity right. As a result, Friedman was required to vacate in August, 1974, the premises which it had been occupying in Bon Aire. Further delays in completing the new supermarket prevented Friedman from entering into possession there until November, 1975.

Friedman initiated this lawsuit on June 29, 1976, in the district court for the Western District of Pennsylvania. In its complaint it asserted that Thorofare and Union had abridged § 1 of the Sherman Act, 15 U.S.C. § 1, and pended to this federal cause of action various state claims for tortious interference by the defendants with Friedman's business relations.[5]

Thorofare and Union moved for summary judgment on the alternative grounds that (1) the district court lacked subject matter jurisdiction because the alleged conduct of the defendants was not sufficiently related to interstate commerce to come within the scope of the Sherman Act; (2) the alleged conduct did not constitute a violation of the Sherman Act; and (3) the Sherman Act claim was time-barred under the governing four-year statute of limitations.

The district court granted defendants' motions for summary judgment. Although the trial judge specifically based his decision only on grounds (1) and (3), he extensively discussed and accepted defendants' position concerning ground (2) as well. Since he concluded that there was no federal question or diversity jurisdiction, the trial judge also dismissed the pendent state law claims.

## II.

A motion for summary judgment is properly granted only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[6] The burden is on the moving party to demonstrate that the test is met, and the non-moving party is entitled to the benefit of all reasonable doubts and inferences that may arise in connection with the consideration of such motion.[7] In applying this standard to the issues in the present case, we are mindful of the Supreme Court's admonition in a celebrated antitrust case that "[t]rial by

---

**3.** Appellee's brief at 5–6; 39.

**4.** Appendix at 91a–95a.

**5.** Friedman also charged in its complaint that Thorofare had monopolized trade in violation of § 2 of the Sherman Act, but did not pursue this contention at trial, and does not challenge on appeal the district court's dismissal of that count.

**6.** Fed.R.Civ.P. 56(c).

**7.** *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Ransburg Electro-Casting Corp. v. Lansdale Finishers, Inc.,* 484 F.2d 1037, 1038 (3d Cir. 1973); 10 C. Wright & A. Miller, Federal Practice and Procedure § 2727.

affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.' "[8]

## A. INTERSTATE COMMERCE

 Section 1 of the Sherman Act prohibits every contract, combination or conspiracy "in restraint of trade or commerce among the several states."[9] To satisfy the requisite jurisdictional element—interstate commerce[10]—the allegedly illegal conduct must constitute "either (1) activities that are in the flow of interstate commerce, or (2) activities which though occurring purely on a local level substantially affect interstate commerce."[11] Substantiality of effect under the second test is to be viewed on a case-by-case, practical economic basis, from the perspective of whether the local activity has a significant impact on competition in commerce and whether the commerce so affected is substantial in volume.[12] Once a material effect on interstate commerce is demonstrated, however, "no specif-

ic magnitude [of reduced interstate commerce] need be proved."[13] In fact, the jurisdictional requirement is satisfied even if interstate commerce is increased by the anticompetitive conduct.[14] Consequently, in determining whether the restrictive covenant and its enforcement in the present case substantially affect commerce, we may consider the interstate ties of Thorofare's Bon Aire supermarket—which stands to gain by the grant of exclusivity—in addition to the interstate connections of Friedman's store.

Plaintiff adduces the following facts in support of its assertion that the alleged combination to eliminate it from Bon Aire substantially affected interstate commerce by reducing the interstate flow of goods to Friedman while increasing the flow to Thorofare:

Friedman's sales at Bon Aire during 1973, the last full year of its operations there, amounted to $849,162. Approximately 20% of this volume represents revenue from the

**8.** *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

**9.** 15 U.S.C. § 1.

**10.** *See Apex Hosiery Co. v. Leader,* 310 U.S. 469, 495, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940):

[T]he phrase "restraint of trade" which . . had a well-understood meaning at common law, was made the means of defining the activities prohibited. The addition of words "or commerce among the several States" was not an additional kind of restraint to be prohibited by the Sherman Act but was the means used to relate the prohibited restraint of trade to interstate commerce for constitutional purposes, *Atlantic Cleaners & Dyers v. United States,* 286 U.S. 427, 434 [52 S.Ct. 607, 76 L.Ed. 1204] so that Congress, through its commerce power, might suppress and penalize restraints on the competitive system which involved or affected interstate commerce.

*See generally,* P. Areeda, Antitrust Analysis ¶ 183 (2d ed. 1974).

**11.** *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48, 50 (3d Cir. 1973). *See also Burke v. Ford,* 389 U.S. 320, 321, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967).

**12.** *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 784–85 & n. 11, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). *See also Mandeville Island Farms v.*

*American Crystal Sugar Co.,* 334 U.S. 219, 232–33, 68 S.Ct. 996, 92 L.Ed. 1328 (1934); *J. P. Mascaro & Sons, Inc. v. William J. O'Hara, Inc.,* 565 F.2d 264, 268–69 (3d Cir. 1977).

**13.** *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 785, 95 S.Ct. 2004, 2012, 44 L.Ed.2d 572 (1975). The Court then applied that principle to the litigation before it: "The fact that there was no showing that home buyers were discouraged by the challenged activities does not mean that interstate commerce was not affected." *Id.*

**14.** *See Burke v. Ford,* 389 U.S. 320, 322 n. 2, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); *United States v. McKesson & Robbins, Inc.,* 351 U.S. 305, 310, 76 S.Ct. 937, 100 L.Ed. 1209 (1956); *United States v. Socony-Vacuum Oil Co., Inc.,* 310 U.S. 150, 221–22, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Such a conclusion is not precluded by the words "in *restraint* of trade or commerce among the several States," 15 U.S.C. § 1 (emphasis added), for, "[t]his single cryptic phrase defines both the conduct prohibited by the Act and the statute's jurisdictional reach." *Rasmussen v. American Dairy Ass'n,* 472 F.2d 517, 521 (9th Cir. 1973). *See Apex Hosiery Co. v. Leader,* 310 U.S. 469, 494–95, 60 S.Ct. 982, 993, 84 L.Ed. 1311 (1940), *quoted in* note 10 *supra* ("restraint of trade" defines substantive violation while "or commerce among the several States" delimits Congress' power to regulate).

sale of meats, some of which Friedman obtained from out-of-state suppliers. At least 1% of Friedman's sales were of products that it purchased directly from out-of-state sellers. Also, Friedman purchased 60% of its merchandise from its franchisor, and a high percentage of these goods had an out-of-state source. Thorofare's sales at Bon Aire increased from $1,723,450 during the fiscal year ending July 31, 1974—the last year it competed with Friedman—to $2,268,859 during the following fiscal year. Fifty-five per cent of the goods sold at that location had been transported across state lines from a company distribution center in Youngstown, Ohio. In addition, Thorofare obtained $322,000 for remodeling its Bon Aire supermarket from earnings generated in Pennsylvania, West Virginia and Ohio. Moreover, the exclusivity clause in the Bon Aire lease, which was a feature sought and obtained by Thorofare in nearly every one of its supermarket leases, has in fact been enforced against a potential tenant from Kansas.

The district court relied on a number of lower court cases [15] to conclude "[w]ithout much discussion" that Friedman had not shown "a reduced flow of goods in interstate commerce." [16] These cases, which dealt with restrictive covenants in leases similar to Thorofare's exclusivity clause, held that an essentially local activity should not be characterized as an interstate enterprise merely because it entails the sale of products that originate out of state, and that such an incidental and insubstantial effect on interstate commerce is insufficient to support federal antitrust regulation. In relying on these cases the trial court appears to have overlooked the more recent statements of both the Supreme Court and this Court regarding the test for determining substantiality of effect on interstate commerce.

### 1.

The Supreme Court's latest pronouncement in this area is *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). There, a small, forty-nine bed proprietary hospital charged that a second hospital and its administrators had conspired with a local official and others in violation of the Sherman Act to prevent the plaintiff from relocating and expanding its facilities. The plaintiff hospital alleged the following connections with interstate commerce: (1) purchases from out-of-state sellers of $112,000 worth of medicine; (2) "substantial number" of out-of-state patients; (3) revenue from out-of-state insurance companies and from the federal government; (4) payment of a management service fee to its parent company, a Delaware corporation based in Georgia; and (5) plans to finance a $4 million expansion with loans from out-of-state lenders. [17] The court of appeals affirmed the district court's dismissal of the Sherman Act claim, reasoning that the hospital's services were strictly local and that they only incidentally affected interstate commerce.

In reversing, the Supreme Court unanimously rejected such an approach. It declared:

> [T]he fact that an effect on interstate commerce might be termed "indirect" because the conduct producing it is not "purposely directed" toward interstate commerce does not lead to a conclusion that the conduct at issue is outside the scope of the Sherman Act. [18]

---

**15.** *St. Anthony-Minneapolis, Inc. v. Red Owl Stores, Inc.,* 316 F.Supp. 1045 (D.Minn.1970) (restrictive covenant in shopping center lease to supermarket); *Savon Gas Stations Number Six, Inc. v. Shell Oil Co.,* 203 F.Supp. 529 (D.Md.1962), *aff'd* 309 F.2d 306 (4th Cir. 1962), *cert. denied,* 372 U.S. 911, 83 S.Ct. 725, 9 L.Ed.2d 719 (1963) (restrictive covenant in shopping center lease to gas station). The district court also cited *Lieberthal v. North Country Lanes, Inc.,* 332 F.2d 269 (2d Cir. 1964)

(alleged conspiracy to prevent opening of local bowling alley).

**16.** *Harold Friedman, Inc. v. Thorofare Markets, Inc.,* Civ. No. 76–858, typed opinion at 4 (W.D. Pa.1977).

**17.** 425 U.S. at 741, 96 S.Ct. at 1851.

**18.** *Id.* at 744, 96 S.Ct. at 1852.

The Court posited that, " '[i]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze,' "[19] and held that "since in this case the allegations fairly claim that the alleged conspiracy, to the extent it is successful, will place 'unreasonable burdens on the free and uninterrupted flow' of interstate commerce, they are wholly adequate to state a claim."[20]

We have already had occasion to discuss the implications of *Hospital Building*. In *Evans v. S. S. Kresge Co.*,[21] a company that had operated a food store under license from a discount department store chain challenged various provisions of the licensing agreement as being illegal under the Sherman Act. After comparing the interstate elements in *Evans* with those present in *Hospital Building*, this Court reversed the district court's determination that the alleged restraint did not have a substantial effect upon interstate commerce. Our conclusion that there existed sufficient jurisdictional facts to subject the conduct to antitrust standards rested on two grounds. We noted that the $400,000 of out-of-state purchases made by the food store in *Evans* far exceeded the $112,000 of purchases involved in *Hospital Building*.[22] Also emphasized was the fact that the provisions under attack were a standard feature of the department store's nationwide licensing agreements.[23]

In a subsequent case, *J. P. Mascaro & Sons, Inc. v. William J. O'Hara, Inc.*,[24] a refuse hauler sued various other haulers, several landfill operators, and a trade association, alleging that defendants had conspired to fix prices and allocate territories so as to drive Mascaro out of business. All of the plaintiff's customers and all but one of the defendants' customers were located in Pennsylvania. During the period in question, Mascaro had purchased at least $310,000 in equipment and supplies manufactured outside of Pennsylvania, had paid $55,000 in premiums to out-of-state insurers, and had borrowed $256,000 from out-of-state lending institutions. In addition, a number of corporate customers had paid $108,000 to Mascaro from their home offices located outside Pennsylvania. We justified our conclusion · that interstate commerce had been substantially affected with the following remarks:

> The conspiracy is said to be aimed at driving the plaintiff out of business and limiting competition among those remaining in the field. That a such a result would significantly decrease the amount of out-of-state purchases by the refuse dealers (and totally eliminate those of Mascaro) as well as increase the amount charged customers who pay from out-of-state is a matter of economic reality.[25]

Viewing the jurisdictional facts alleged by Friedman in the illumination provided by *Hospital Building, Evans* and *J. P. Mascaro*, we conclude that there exist in the present situation sufficient connections with interstate commerce to satisfy the jurisdictional requirement of the Sherman Act. As in *Evans*, the exclusivity clause that served as an integral factor in the challenged conduct was a component of nearly all of Thorofare's leases. Moreover, the exclusivity right at Bon Aire had been en-

**19.** *Id.* at 743, 96 S.Ct. at 1852, *quoting United States v. Women's Sportswear Ass'n.*, 336 U.S. 460, 464, 69 S.Ct. 714, 93 L.Ed. 805 (1949).

**20.** *Id.* at 746, 96 S.Ct. at 1853.

**21.** 544 F.2d 1184 (3d Cir. 1976), *cert. denied*, 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977).

**22.** 544 F.2d at 1189–90.

**23.** *Id.* at 1190.

**24.** 565 F.2d 264 (3d Cir. 1977).

**25.** *Id.* at 268.

We also discussed *Hospital Building* in *Mortensen v. First Federal Savings and Loan Assn.*, 549 F.2d 884 (3d Cir. 1977), where we found that the facts as alleged in the complaint established a sufficient nexus to interstate commerce to withstand a pretrial jurisdictional attack, considering the "apparent increase in the jurisdictional reach of the Sherman Act." *Id.* at 897.

forced by Thorofare against a potential out-of-state tenant. Finally, the value of the products traveling through interstate commerce to Friedman's and Thorofare's Bon Aire stores clearly exceeds the amount involved in *Hospital Building*.

### 2.

■ Beyond the favorable comparison between the jurisdictional facts in the present case and those held to be sufficient in recent precedents lies a further compelling reason for concluding that the restrictive lease covenant and its enforcement may be scrutinized under the antitrust laws. As the Supreme Court has declared on numerous occasions, and has reaffirmed in *Hospital Building*, Congress intended with passage of the Sherman Act to regulate conduct as far as the commerce clause would permit,[26] and consequently, the reach of the Sherman Act expands with each extension of the commerce power.[27] Under current interpretation. the compass of the commerce power is broad; indeed, as Jus-

tice Cardozo cogently put it, "as broad as the need that evokes it."[28] When national interests are implicated, federal regulation of local activities once thought to be impervious to such control invariably is upheld. Thus, for instance, a restaurant's annual purchase of about $70,000 of meat from a local supplier who had procured it from outside the state was sufficient to bring the restaurant within the purview of federal supervision under the commerce clause.[29] And Congress was held to have the power to limit the amount of wheat that farmers may grow in their own fields for their own use on the ground that the cumulative effect of individual farmers' self-satisfaction of their needs would reduce the interstate market demand for wheat.[30] Although lower courts on occasion have inexplicably limited the jurisdictional scope of the Sherman Act,[31] the Supreme Court's treatment of interstate commerce in the context of challenges to jurisdiction under the Act substantiate its assertion that the Act's scope is coextensive with that of the commerce power. Any doubt as to this matter

**26.** *See, e. g. United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 558–59, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440 (1944) ("That Congress [in passing the Sherman Act] wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements . . . admits of little, if any, doubt. The purpose was to use that power to make of ours, so far as Congress could under our dual system, a competitive business economy.") *See also Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 194, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974); *United States v. Frankfort Distilleries, Inc.*, 324 U.S. 293, 298, 65 S.Ct. 661, 89 L.Ed. 951 (1945); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 495, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 435, 52 S.Ct. 607, 76 L.Ed. 1204 (1932).

**27.** *See, e. g., Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 743 n. 2, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 606, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (Blackmun, J., concurring); *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 232 n. 11, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). This Court has liberally applied the instructions of the Supreme Court in this matter, *see e. g., J. P. Mascaro & Sons, Inc. v. William J. O'Hara, Inc.*, 565 F.2d 264, 267–68 (3d Cir. 1977); *Doc-*

*tors, Inc. v. Blue Cross of Greater Philadelphia*, 490 F.2d 48 (3d Cir. 1973).

The expansive interpretation given to the jurisdictional scope of the Sherman Act is to be contrasted with the more restrictive jurisdictional standards of the other antitrust laws. The "in commerce" language of the Clayton Act, 15 U.S.C. §§ 12–27, and of the Robinson-Patman Act, 15 U.S.C. §§ 13, 13a–c, 21a, has been read to require that the conduct must occur directly in the flow of interstate commerce. *See Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 199–202, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974).

**28.** *Carter v. Carter Coal Co.*, 298 U.S. 238, 328, 56 S.Ct. 855, 880, 80 L.Ed. 1160 (1936) (Cardozo, J., dissenting).

**29.** *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (Civil Rights Act of 1964).

**30.** *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1972). *See also Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 682 (1971) (local loan sharking subject to federal criminal sanctions).

**31.** *See generally*, Note, *Portrait of the Sherman Act as a Commerce Clause Statute*, 49 N.Y.U.L. Rev. 323 (1974).

has been laid to rest by *Goldfarb v. Virginia State Bar*[32] and *Hospital Building*.[33]

Of course, even under this expansive approach towards jurisdiction under the Sherman Act, local activities may not be subjected to federal standards if the requisite nexus to interstate commerce is missing. We need not, however, explore at this time the outer limits of federal power, for the conduct involved in this case must be deemed a proper subject for antitrust regulation. As the corporate practices of such supermarket chains as Thorofare amply demonstrate, the retail sale of food and household commodities is no longer effectuated solely through neighborhood grocery stores that order their supplies independently from local wholesalers. Although the consumer outlets necessarily must serve discrete localities, the trend is toward increased concentration in the infrastructure that administers and supplies the local stores.[34] Therefore, when a large interstate supermarket chain is in the picture, anticompetitive activities directed at an individual store will inevitably have a substantial effect upon the flow of goods across state lines to either the victimized establishment or the firm that is engaged in the anticompetitive practice, if not to both. Where, as here, such interstate supermarket industry is involved, it cannot be said that the "relationship to interstate commerce is too tenuous in a practical sense to warrant federal control."[35]

### 3.

Thorofare takes a different approach from that of the district court in maintaining that the jurisdictional requirement of the Sherman Act has not been satisfied. It argues that the allegedly anti-competitive activities of the defendants did not proximately cause any reduction that may have occurred in the interstate flow of goods to Friedman. Thorofare concedes that its enforcement of the exclusivity clause of its lease against Friedman forced Friedman to vacate the Bon Aire premises at the expiration of plaintiff's lease. But, Thorofare contends, Friedman was aware for a number of years of the termination date of its lease. So under normal circumstances, it submits, the lease expiration—even where it resulted from anticompetitive activity—

32. 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). In *Goldfarb* the Court determined that there was jurisdiction even though the attorneys' title examinations, the minimum fee schedule for which was under attack, were performed wholly intrastate. It reasoned that "in a practical sense" title examinations were "an integral part" of the intrastate aspects of purchasing a home since they are prerequisites for obtaining a home mortgage. Home mortgages were considered interstate transactions because roughly half of them were granted by out-of-state lenders and many were insured by out-of-state, federal agencies. In reaching its conclusion the Court deemed inconsequential the fact that there was no showing of a detrimental effect upon the interstate commerce in question, apparently requiring only that there be a connection with interstate commerce. *Id.* at 783–85, 95 S.Ct. at 2011. *See* Comment, *The Confusing World of Interstate Commerce and Jurisdiction Under the Sherman Act—A Look at the Development and Future of the Currently Employed Jurisdictional Tests*, 21 Villanova L.Rev. 721, 744 (1976).

33. 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), discussed at length *supra*. *Goldfarb* and *Hospital Building* follow the thrust of earlier Supreme Court cases. *See, e. g., Burke v.* *Ford*, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967) (effect on commerce inferred from horizontal territorial division among local liquor wholesalers in that such agreement inevitably reduces competition, which invariably causes prices to rise and results in lower sales, which in turn means lower imports from out-of-state manufacturers; this despite fact that imports actually increased); *United States v. Employing Plasterers Ass'n*, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954) (control of competition in Chicago's plastering business affects flow of plastering materials from outside state).

34. *See United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966) (discussion of trend toward concentration in Los Angeles retail grocery market).

35. Stern, *The Commerce Clause and The National Economy*, 1933–1946 (Part 1), 59 Harv.L. Rev. 645, 673 (1946), describing the test articulated by Justice Cardozo in *Carter v. Carter Coal Co.*, 298 U.S. 238, 324, 56 S.Ct. 855, 80 L.Ed. 1160 (1936) (Cardozo, J., dissenting), a position that was later adopted by a majority of the Court. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 393–94, 60 S.Ct. 907, 84 L.Ed. 1263 (1940).

would not have given rise to a reduced flow of goods in interstate commerce, because Friedman would have immediately relocated in the same geographic market and continued in competition. Rather, in Thorofare's view, the adverse impact on interstate commerce in this case was caused by the sixteen-month delay in the opening of Friedman's substitute location, which itself was the result of unrelated complications.

Thorofare's line of reasoning in this regard cannot justify the granting of its motion for summary judgment, since plaintiff was entitled to have the disputed facts construed in the light most favorable to it when the court decided that motion. Friedman's contentions that it had not been told of the exclusivity clause until late 1973 or early 1974 and that it had been reassured by Union on numerous occasions that its lease would be renewed can support a finding that a sufficient causal nexus exists between the anticompetitive conduct and the reduced flow of goods in interstate commerce. Therefore, Friedman must be afforded the opportunity to have the factfinder consider evidence on the causation issue.

■ Furthermore, even were the material facts to be resolved in Thorofare's favor, we would be constrained to reject Thorofare's argument that no jurisdiction may be asserted under the Sherman Act. Thorofare's focus on causation is premised on the assumption that a reduced flow of goods in interstate commerce is a prerequisite for federal regulation predicated upon the commerce power. It is evident, however, that the increased interstate flow to Thorofare, which was a consequence of its anticompetitive conduct, is sufficient to support the exercise of federal power.[36] Thus, although the question whether the defendants' conduct caused a restraint of Friedman's trade may be relevant for establishing the substantive elements of a claim under § 1 and

for assessing damages to Friedman,[37] it does not pose a barrier to the exercise of federal antitrust jurisdiction.

Accordingly, we conclude that the district court erred in holding, before trial, that the alleged conduct did not substantially affect interstate commerce and therefore could not be challenged under the Sherman Act.

## B. STATUTE OF LIMITATIONS

■ As a second ground for granting defendants' motions for summary judgment, the district court decided that the action was barred under the applicable statute of limitations. 15 U.S.C. § 15b requires that suits to recover damages for violations of § 1 of the Sherman Act be "commenced within four years after the cause of action accrued." An antitrust claim "accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."[38] However, with regard to damages that have not yet been suffered and are too speculative to be ascertainable at the time plaintiff's business is injured, the Supreme Court has held that the limitations period does not begin to run until the damages are inflicted and ascertainable.[39]

The district court determined that Friedman was injured either on July 30, 1971, or on November 16, 1971. In settling on July 30, 1971—the day Thorofare executed the new lease granting it exclusivity rights—as one of the possible dates for commencement of the limitations period, the trial court reasoned that since the lease was, by its terms, sufficient to exclude Friedman after June 30, 1974, defendants had on that date committed an act that injured Friedman's business. Alternatively, the district court declared that Friedman's claim accrued on November 16, 1971, when it signed a two-year extension of its lease, since at that time "[t]here is no doubt under this record

---

36. See text accompanying note 14 supra.

37. See Martin B. Glauser Dodge Co. v. Chrysler Corp., 570 F.2d 72, 81 (3d Cir. 1977).

38. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971).

39. Id. at 338–39, 91 S.Ct. at 806.

that the plaintiff was aware that Thorofare had the ability to exclude it." [40] The Court also was of the opinion that damages were sufficiently ascertainable at either of those times, so that there was no reason for extending the limitations period. Consequently, the court concluded that the limitations period had run by the time Friedman instituted its suit on June 29, 1976.

We have grave reservations whether Friedman's antitrust claim may be said, at least on a motion for summary judgment, to have accrued on either of the dates discussed by the district court. [41] In any event, however, we conclude that Friedman's law-suit was timely filed because in our view damages were not ascertainable in 1971, and also because the defendants' refusal in May, 1974, to grant Friedman a four-month extension of its Bon Aire Lease gives rise, by itself, to a cause of action.

The district court's assessment that damages were ascertainable in 1971 and that therefore there was no reason for extending the limitations period is not convincing. In reaching its conclusion, the trial court relied solely on dicta in *Landon v. Twentieth-Century Fox Film Corp.*, 384 F.Supp. 450 (S.D. N.Y.1974). There the court intimated that the value of copyright renewal rights to

---

**40.** Typed opinion at 9.

**41.** Thorofare urges that the district court's choice of July 30, 1971, as one of the alternative dates on which Friedman's claim accrued is supported by a number of district court cases that hold that an antitrust claim based upon an allegedly anticompetitive agreement to which the plaintiff had been a party accrues at the time the agreement was executed rather than at the time of its enforcement or effectuation. Defendant refers us to *Landon v. Twentieth Century-Fox Film Corp.*, 384 F.Supp. 450, 458 (S.D.N.Y.1974); *Fleischer v. A. A. P., Inc.*, 180 F.Supp. 717, 723–24 (S.D.N.Y.1959), *aff'd on other grounds* 329 F.2d 424 (2d Cir. 1964); *Sandidge v. Rogers*, 167 F.Supp. 553, 557–558 (S.D.Ind.1958); *cf. Farbenfabriken Bayer, A.G. v. Sterling Drug, Inc.*, 153 F.Supp. 589, 592–594 (D.N.J.1957), *aff'd on other grounds*, 307 F.2d 210 (3d Cir. 1962), *cert. denied* 372 U.S. 929, 83 S.Ct. 872, 9 L.Ed.2d 733 (1963).

We note in passing that the cases adduced by Thorofare are of dubious validity, even in situations where the antitrust plaintiff had been a party to the anticompetitive agreement. The Fifth Circuit, whose approach to the statute of limitations issue presented in this case we adopt, specifically disapproved of those decisions. *See Imperial Point Colonnades Condominium v. Mangurian*, 549 F.2d 1029, 1042 & n. 22 (5th Cir. 1977), *cert. denied*, 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1978).

Be that as it may, we find the analogy to such citations unpersuasive. Unlike those cases, the present case concerns an agreement to which plaintiff Friedman was not a party and which on its face was directed to any and all potential competitors. If Thorofare were subsequently to enforce its right of exclusivity against a potential tenant, that party's claim would accrue as of the date it became the object of the anticompetitive activity, not on July 30, 1971. *Cf. Braun v. Berenson*, 432 F.2d 538, 543 (5th Cir. 1970) (each refusal to lease newly available store space to plaintiff gives rise to new cause of action). Similarly, even though Friedman was already a tenant at Bon Aire, its cause of action did not accrue until it was injured.

Precisely when such injury occurred appears to turn on disputed factual issues that would preclude summary judgment. The factfinder might ultimately decide that Friedman was injured with the signing of Thorofare's lease on July 30, 1971. On the other hand, upon presentation of all the evidence, the factfinder might determine that Friedman was not adversely affected by defendants' actions until a later point in time. For example, the evidence might support a finding that Friedman commenced searching for a substitute site not because it knew that its lease would not be renewed, but rather because it chose to exercise its prerogative to relocate upon the termination of its lease. Under these circumstances, the factfinder could justifiably conclude that Friedman was not injured until it was foreclosed by the anticompetitive activity from negotiating a temporary extension of its lease in May, 1974.

Similarly, the suggestion by the district court that Friedman's cause of action accrued on November 16, 1971, seems to rest on the disputed factual issue of when Friedman became cognizant of Thorofare's right of exclusivity. Here again, given this apparent factual dispute, summary judgment would seem to be inappropriate. Furthermore, we do not believe that the date Friedman first attained knowledge of the restrictive covenant is relevant to the question of when plaintiff's cause of action accrued, inasmuch as that issue hinges on when Friedman was injured, not on when it became aware of the injury. Indeed, in the absence of fraudulent concealment by the defendants—and none is alleged here—the statute is not tolled by plaintiff's failure to discover the existence of the cause of action. *E. g., Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co.*, 210 F.Supp. 557 (N.D.Ill., 1962), *aff'd* 315 F.2d 558 (7th Cir. 1963).

commence in 1972 was capable of calculation in 1944, reasoning as follows:

> The fact that the parties to [copyright assignment] agreements are able to place some ascertainable present value on an expectancy interest in the renewal copyright to come into being twenty-eight years later is strong evidence that future damages flowing from an illegal tying arrangement involving the renewal rights can be calculated with reasonable certainty at the time of the original assignment.

*Id.* at 458. However, the type of guidelines present in *Landon* did not exist in 1971 for estimating Friedman's damages. Friedman seeks to recoup lost profits that resulted from its relocation—damages that could not be anticipated in 1971. As the Supreme Court has noted, "refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered." [42] Accordingly, we conclude that even were the district court correct in holding in the context of a motion for summary judgment that Friedman had been injured at some time in 1971, Friedman's suit to recover damages would not be barred under the four-year statute of limitations.

Our conviction that Friedman's suit was not untimely brought is prompted by a second consideration as well. When defendants in May, 1974, denied Friedman's request to delay by four months the closing of its Bon Aire store, they engaged in allegedly anticompetitive conduct injurious to Friedman. Nonetheless, it is contended that Friedman's suit, which was filed within four years of that occurrence, is untimely because defendants' activities were grounded upon an exclusivity clause in a lease that was entered into more than four years before the commencement of the suit.

A number of courts of appeals have faced the issue whether a plaintiff is precluded from suing for damages resulting from injuries that were caused by anticompetitive conduct if the conduct was authorized by a possibly unlawful contract that had been entered into before the limitations period had begun to run. The Fifth Circuit, after a lengthy and scholarly discussion of the principles to be derived from earlier decisions, restated "the basic rule that a cause of action accrues each time a defendant commits an act that injures plaintiff." [43] That court held that it "would not view the fact that the leases were executed outside the statutory period as barring suit for injurious acts committed under them within the period." [44] The position of the Fifth Circuit is well-reasoned, and we adopt it. Accordingly, inasmuch as the defendants committed an injurious act against Friedman under the imprimatur of the exclusivity clause by refusing to grant the four-month extension in May, 1974, such act may serve as a basis for Friedman's antitrust suit, independent of any claim that may have accrued in 1971. [45]

---

**42.** *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). *See also Continental-Wirt Electronics Corp. v. Lancaster Glass Corp.*, 459 F.2d 768, 770 (3d Cir. 1972), *on remand*, 370 F.Supp. 1018 (E.D.Pa.1973).

**43.** *Imperial Point Colonnades Condominium v. Mangurian*, 549 F.2d 1029, 1035 (5th Cir. 1977), *cert. denied*, 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1978).

**44.** *Imperial Point Colonnades Condominium v. Mangurian*, 549 F.2d 1029, 1042 & n. 22 (5th Cir. 1977), *cert. denied*, 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1978). *See also Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117, 123–29 (5th Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); *Braun v. Berenson*, 432 F.2d 538, 543 (5th Cir. 1970) ("refusal to lease a space unavailable during the time intervening after a prior refusal is not the 'reiteration' of a 'refusal to deal' policy," and limitations period begins anew from the later refusal to lease).

**45.** Defendants' conduct does not come within either of the caveats voiced by the Fifth Circuit when it laid out the general rule that a new cause of action accrues with each injurious act committed against the plaintiff. Under the first caveat, suit must be brought within four years of the first injurious act if "the violation is final at its impact," as, for example, "where the plaintiff's business is immediately and permanently destroyed, or where an actionable wrong is by its nature permanent at initiation without further acts." *Imperial Point, supra*, at 1035, *quoting Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117, 126–27 (5th Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct.

In view of our conclusion that damages were not ascertainable until 1974, and that defendants' refusal to grant Friedman an extension of its lease in May, 1974, was independently actionable, we hold that it was error to grant summary judgment on timeliness grounds.

## C. VIOLATION OF § 1 OF THE SHERMAN ACT

■ The final ground upon which defendants based their motions for summary judgment is that the restrictive covenant and its enforcement against Friedman either singly or together do not constitute a violation of the Sherman Act. In granting summary judgment in defendants' favor, the district court purported to address only the jurisdictional and statute of limitations grounds. Nevertheless, in the course of its treatment of the interstate commerce issue, the trial court also concluded that the challenged activities were lawful under the Act. On this appeal defendants pursue their contention that their activities were lawful, and argue that the grant of summary judgment may also be affirmed for this reason.

Because a court of appeals may affirm a district court's decision on a different ground from that assigned by the trial court,[46] and inasmuch as the district court may in any event have based its decision upon its appraisal of plaintiff's substantive claim, we shall now review that matter.

On its face, § 1 of the Sherman Act appears to interdict any agreement that is "in restraint of trade." Were that section to be read literally, however, every commercial contract would be violative of the Act. Accordingly, the Supreme Court has adopted for the most part a "rule of reason" analysis for scrutinizing business relationships, so that only unreasonable restraints of trade are forbidden.[47] At the same time, the Supreme Court has viewed certain combinations—those "which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable"[48]—as *per se* violations. But such a *per se* violation is seldom found until courts have had considerable experience in evaluating the challenged anticompetitive conduct.[49] In the absence of conduct that has been classified as a *per*

784, 46 L.Ed.2d 643 (1976). However, in the words of the Fifth Circuit, Thorofare and Union "could quit causing the injury of which the plaintiff complains at any time, simply by *not* enforcing . . . the contract in question; hence, in *Poster Exchange*'s words, the violation is not 'final at its impact . . . or . . by its nature permanent at initiation without further acts.'" *Id.* at 1037. (emphasis in original).

The second caveat is "that a cause of action will not lie for damages that occur within the four years preceding suit, if those damages result solely from acts committed by the defendant outside the four-year period." *Id.* at 1035. Such is not the situation here, where Friedman alleges that its damages were caused by defendants' refusal in May, 1974, to extend its lease.

**46.** *PAAC v. Rizzo*, 502 F.2d 306, 308 (3d Cir. 1974), *cert. denied*, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975) ("It is proper for an appellate court to affirm a *correct* decision of a lower court even when that decision is based on an inappropriate ground.") (emphasis in original).

**47.** *See, e. g., Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):

But the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

**48.** *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

**49.** *See White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Evans v. S. S. Kresge Co.*, 544 F.2d 1184, 1191, 1192 (3d Cir. 1976).

*se* violation, however, a court must generally engage in "an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable." [50] Despite the heavy burden these cases place upon federal courts, the Supreme Court has instructed that "summary procedures should be used sparingly in complex antitrust litigation." [51]

Defendants submit, and the district court apparently decided, that the restrictive covenant in Thorofare's lease must be tested under the "rule of reason" standard. Nevertheless, they seek to avoid the conclusion that the clause's reasonableness should be determined at a full-dress trial. They do so by adducing cases to support the ostensibly settled proposition that "sellers of property may enter into exclusive dealing arrangements with persons promising not to sell to others in an entire geographic area without encountering antitrust violations." [52] The district court characterizes the exclusivity clause in the lease as "a promise that the landlord would not sell the same kind of property interest to another purchaser (tenant) in the same geographic area," [53] and justifies the arrangement as necessary to induce Thorofare to expend funds to improve the economic viability of an old, out-dated shopping strip area with very limited parking facilities. In addition, the defendants and the district court claim that for the exclusivity clause to be declared an unreasonable restraint of trade, plaintiff must prove that the location of the premises in question is unique. They then proceed to infer from Friedman's finding of an alternative location that such fact could not be established.

Friedman, on the other hand, urges us to hold that exclusivity provisions in shopping center leases are *per se* violations of § 1, and thereby adopt the position taken by the Federal Trade Commission [54] as well as by at least one commentator. [55] Alternatively, Friedman maintains that the conduct in question is an unreasonable restraint of trade and that it should be allowed to prove its allegation in this regard at trial.

We do not at this time choose to accept plaintiff's invitation to subject exclusivity clauses in shopping center leases to a *per se* rule. To date, judicial experience with this form of anticompetitive conduct has been limited. [56] Also, we are not persuaded, at

---

**50.** *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

**51.** *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) (noting that summary judgment is inappropriate "where motive and intent play leading roles"). *See also White Motor Co. v. United States*, 392 U.S. 253, 259, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). Upon surveying the cases, one commentator has understandably concluded that there is a greater reluctance to uphold a grant of summary judgment where the conduct was to be examined for its reasonableness than where it was correctly subjected to a *per se* rule. 15 Von Kalinowski, Antitrust Laws and Trade Regulation § 113.02 (1978).

**52.** For this proposition, the trial court relied on *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), and *Packard Motor Car Co. v. Webster Motor Car Co.*, 100 U.S.App.

D.C. 161, 243 F.2d 418, *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957).

**53.** Typed opinion at 6.

**54.** *See e. g. Gimbels Brothers, Inc.* 1973–76 FTC Complaints & Orders ¶ 20,478 (1974); *Tysons Corner Regional Shopping Center*, 85 F.T.C. 987, 1973–76 FTC Complaints & Orders ¶ 20,933 (1975).

**55.** Note, *The Antitrust Implications of Restrictive Covenants in Shopping Center Leases*, 86 Harv.L.Rev. 1201 (1973).

**56.** *See* Goldschmid, *Antitrust's Neglected Stepchild: A Proposal for Dealing with Restrictive Covenants Under Federal Law*, 73 Colum.L. Rev. 1193 (1973). So far, most reported opinions deal with pretrial motions and do not contain economic evaluations of restrictive covenants. *E. g., Borman's Inc. v. Great Scott Supermarkets, Inc.*, 433 F.Supp. 343 (E.D.Mich. 1975) (granting defendant's motion for preliminary injunction); *Dart Drug Corp. v. Peoples Drug Stores, Inc.*, 1977–1 CCH Trade Cas. ¶ 61,281 (D.C.C.1977) (denying defendant's mo-

least at present, that such agreements are devoid of a legitimate purpose and are unreasonable in all conceivable circumstances.[57] Nevertheless, we agree with Friedman that the unreasonableness of the conduct under attack cannot be determined on a motion for summary judgment.

Although we write on a relatively clean slate in the area of antitrust implications of restrictive lease covenants, exclusive dealing arrangements between manufacturers and dealers may be sufficiently similar so as to serve as a useful benchmark for analysis. For, in both situations, a business entity in control of a product restrictively selects the parties to whom it will sell the commodity.

As an initial proposition, we note that the Supreme Court has recognized the right of manufacturers to exercise discretion in deciding with whom they shall deal and with whom they shall refuse to deal.[58] Thus, a manufacturer may arrange for an exclusive dealership for the sale of its products.[59] Likewise, a manufacturer is free to terminate its association with a particular dealership.[60] But such rights are "neither absolute nor exempt from regulation." [61] Particularly where the refusal to deal is not unilateral but rather is prompted by an understanding with other parties, an antitrust violation may be found, either by application of a *per se* rule [62] or through a "rule of reason" [63] analysis.

In the present case, Union's refusal to extend Friedman's lease was not an independent decision on its part, but rather was first precipitated by its agreement with Thorofare and then sustained by Thorofare's insistence that Union adhere to the agreement.[64] Accordingly, the restraint

---

tions to dismiss and for summary judgment); *Savon Gas Stations No. 6, Inc. v. Shell Oil Co.*, 309 F.2d 306 (7th Cir. 1962), *cert. denied*, 372 U.S. 911, 83 S.Ct. 725, 9 L.Ed.2d 719 (1963) (affirming summary judgment). *But see Pay Less Drug Stores Northwest, Inc. v. City Products Corp.*, 1975–2 CCH Trade Cas. ¶ 60,325 (D.Or.1975) (protection clause held unreasonable restraint; however, no detailed discussion of economic factors).

**57.** Friedman argues that this case is governed by the *per se* rule announced in cases involving group boycotts and concerted refusals to deal, *e. g., United States v. General Motors*, 384 U.S. 127, 145–47, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Klor's v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Those situations, however, are distinguishable from the restrictive lease covenant challenged by Friedman in a number of crucial respects. They involve a horizontal agreement among the suppliers of the product of other element necessary for the victimized concern to compete, for the specific purpose of eliminating the competitor. In contrast, Thorofare's exclusivity clause is a vertical agreement, free from any horizontal aspects, and might serve legitimate business purposes. For the most part, only horizontal restraints have been declared *per se* illegal. *See United States v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Evans v. S. S. Kresge*, 544 F.2d 1184, 1192 & n. 26 (3d Cir. 1976). Furthermore, we are reminded of this Court's admonition in *DeFilippo v. Ford Motor Co.*, 516 F.2d 1313 (3d Cir.), *cert. denied* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975), that " '[t]he term "group boycott" . . . is in reality a very broad label for divergent types of concert-
ed activity. To outlaw certain types of business conduct merely by attaching the "group boycott" and "per se" labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed.' " *Id.* at 1317–18, *quoting Worthen Bank & Trust Co. v. National Bank Americard, Inc.*, 485 F.2d 119, 125 (8th Cir. 1973), *cert. denied* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974).

**58.** *E. g., Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

**59.** *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 376, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

**60.** *See United States v. Parke, Davis & Co.*, 362 U.S. 29, 45, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

**61.** *Lorain Journal Co. v. United States*, 342 U.S. 143, 155, 72 S.Ct. 181, 187, 96 L.Ed. 162 (1951).

**62.** *See e. g. Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

**63.** *See, e. g., Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir. 1978); *Anderson v. American Automobile Ass'n*, 454 F.2d 1240 (9th Cir. 1972).

**64.** The existence of that agreement, as embodied in the exclusivity clause contained in the

must be scrutinized for its reasonableness. We are aided in this endeavor by certain general considerations: The reasonableness of any anticompetitive conduct may be judged only after careful consideration of the effect it will have on competition. The purpose of such activity, the structure of the industry, and the strength of competition in the relevant geographic and product markets are among the factors that generally mold the outcome of such analysis. Of course, no single aspect is dispositive. Also, conclusions reached by courts in one context are not necessarily applicable in another.[65]

So far, no court has carefully considered the economic impact of exclusivity clauses in shopping center leases.[66] Unlike the district court, therefore, we are not prepared at this time to apply to the present case the precedents that have accumulated in related areas, especially since a number of distinguishing characteristics are apparent. The exclusive dealerships that manufacturers grant distributors may be found to be reasonable restraints, even when territorial restrictions on resale are imposed upon the dealer, on the ground that the loss in intrabrand competition is offset by the en-

hanced interbrand competition that results from allowing the manufacturer to achieve more efficient distribution of his products.[67] Arguably, restrictive lease covenants do not yield similar countervailing benefits. Indeed, often they are vehicles by which the shopping center's largest tenant excludes smaller competitors who would offer goods at a discount. Given the consumer drawing power of any successful shopping center, exclusion from it "may effectively mean exclusion from a whole trade area, or at least a significant competitive disadvantage for the excluded party." [68]

Furthermore, a number of aspects of this case render the application to it of a general rule particularly inappropriate. On the one hand, the restraint might be deemed reasonable in light of the fact that Bon Aire consists of a small strip of stores with limited parking facilities, and that apparently both Friedman and Thorofare were given an opportunity to bid for an exclusive position. On the other hand, the granting of a right of exclusivity seems less tenable under the antitrust laws when one of its purposes and obvious effects is to eliminate a present competitor than when it merely

lease, together with Union's refusal to extend Friedman's lease, may well refute Union's contention—put forth at oral argument—that it was not a party to any "contract, combination or conspiracy in restraint of trade." Although there is no direct evidence that Union shared Thorofare's motive of eliminating a competitor, Union cannot automatically be absolved from liability on this ground, particularly since it might well have known of Thorofare's purpose and "materially aided in the accomplishment of [its] plan." *See Albrecht v. Herald Co.*, 390 U.S. 145, 149–50, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). Nor may Union necessarily find refuge in this Court's recent opinion in *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068 (3d Cir., filed June 26, 1978). In *Kroger*, instead of participating in the accomplishment of its co-defendant's conspiracy, the shopping center landlord "successively resisted the attempts of the defendant to force it to go along." *Id.*, at 1075. Union, on the other hand, apparently acceded to Thorofare in granting it an exclusivity right and in refusing to extend Friedman's lease.

**65.** *See, generally, United States v. First National Bank*, 376 U.S. 665, 667–68, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964); *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872,

97 L.Ed. 1277 (1953); *Schine Theatres v. United States*, 334 U.S. 110, 124, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); *Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1246–48 (3d Cir. 1975); 1 Von Kalinowski, Antitrust Laws and Trade Regulations §§ 6.02[1], 6.02[4] (1978); L. Sullivan, Antitrust 186–92 (1977).

**66.** *See* note 55 *supra.*

**67.** *See Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54–55, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Such restrictions increase interbrand competition by making it possible for manufacturers "to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required" and "to engage in promotional activities or to provide service and repair facilities." *Id.* at 55, 97 S.Ct. at 2561. *But see Bravman v. Bassett Furniture Industries, Inc.*, 552 F.2d 90 (3d Cir. 1977) (jury may conclude that manufacturer's restrictions on its sales representative were unreasonable).

**68.** Note, *supra* note 55, at 1208.

precludes potential future entry into the market. A final conclusion regarding the reasonableness of the restraint in this case must also await some evaluation of the relevant geographic market and the degree to which the Bon Aire location has unique competitive advantages in that market—facts that will undoubtedly be developed at the trial.

In light of the foregoing, it is apparent that the reasonableness of the allegedly anticompetitive conduct by defendants can be determined only after the evidence adduced at trial is assessed.

### III.

The judgment of the district court will be vacated, and the cause remanded to the district court for further proceedings consistent with this opinion.[69]

---

**69.** Inasmuch as the case is being remanded for trial, the district court may wish to reconsider whether it should entertain Friedman's pendent state claims.